SUSANA CABRERA *v.* JOSE CABRERA
(8517)

DUPONT, C. J., FOTI and LAVERY, Js.

Argued June 4—decision released September 18, 1990

*Philip M. French,* for the appellant (defendant).

*James B. McCarthy,* with whom was *Thomas C. Coughlin,* for the appellee (plaintiff).

DUPONT, C. J. In this action, the defendant appeals from the judgment of the state trial referee, acting as the court, dissolving his marriage to the plaintiff and making certain child custody and financial awards, and from its amended judgment awarding attorney's fees to the counsel for the parties' children. The defendant claims that the court improperly (1) excluded all

testimony of a psychologist consulted by the parties, (2) overruled at trial an existing court order that the defendant was entitled to an independent psychiatric examination of the plaintiff, (3) awarded sole custody of the two minor children to the plaintiff, and (4) made certain financial awards.

The court found certain relevant facts. The parties began dating when the plaintiff was thirteen and the defendant, then seventeen, asked the plaintiff's parents, apparently without consulting her, for permission to date the plaintiff on an exclusive basis. This relationship lasted until the parties married. The plaintiff was then seventeen, and the defendant, twenty-two. During the first year of the marriage, a child was born but died shortly after birth. The couple subsequently had two other children.

The defendant, a college graduate, earns approximately $60,000 a year and is a senior accountant with the Louis Dreyfus Corporation. The plaintiff is employed as an aide to a handicapped child in a school during the school year and earns $223.80 per week during that period. The court found that the parties' marital problems surfaced when the plaintiff met a young man who was hired to do structural work at the parties' home. The plaintiff became enamored of him, although, at the time of trial, no physical contact between the plaintiff and the worker had occurred, and, in fact, their only contact had been by mail or phone.

After the plaintiff informed the defendant of her feelings about the defendant's treatment of her and her feelings about the worker, the defendant suggested joint marital counseling, to which the plaintiff agreed. A psychologist, Wendy Joondeph, was the marriage counselor retained. After several weekly sessions, she recommended that the plaintiff be hospitalized, and the plaintiff followed her advice. At that time, the plain-

tiff was behaving in an unusual manner. Reportedly, she was often in bed and did not prepare meals for the family. After two weeks, the plaintiff was released from the hospital and returned home. Subsequently, she voluntarily spent two months in the hospital and continued in outpatient therapy with Joondeph for three months, after which she chose to discontinue both her sessions with Joondeph and medication. The plaintiff subsequently filed this dissolution action.

The plaintiff has not been in therapy since that time, but was evaluated by David Zucker, a psychiatrist, over a three to five month period. Zucker testified that in his opinion the plaintiff is presently capable of caring for the children, although she will probably need some support because of her dependent personality. She works thirty hours per week during the school year and arrives home each day at about the same time as her children.

The family relations report recommended that custody be given to the defendant father with supervised visitation to the plaintiff. That report was based on reports from Rye Psychiatric Hospital and Joondeph. The family relations worker who wrote that report had failed to talk to Zucker and conceded at trial that she had failed to obtain from him what she considered adequate information about his psychiatric examination of the plaintiff, which was more recent than those by Joondeph and Rye Psychiatric Hospital. The results of Zucker's examination were, therefore, not taken into consideration even in a second, purportedly updated, family relations report. The court determined that the recent evaluation by Zucker was the appropriate one to be considered, based upon both Zucker's testimony and that of the plaintiff. The court found that the plaintiff appeared to be a capable person.

The court also found that from the time the divorce was filed, the defendant had "practically absented himself from home," coming home only to eat by himself and to sleep. The court further found that his actions had resulted in his leaving the plaintiff in total charge of the home and children for a period of at least five months. Furthermore, the court found that "on the occasions when the defendant has asserted 'management' of the house, he has not discussed anything with the plaintiff but instead has called the police—a somewhat unusual way of helping to settle a domestic dispute. His reason for doing that he said was to make a record. The fact that it also had some effect on his wife and his children seemed to be of no consequence to him." The court concluded that the defendant had been insensitive to the plaintiff's needs during the marriage and that his recent acts underlined that insensitivity, that the "children love both parents, have no fear of their mother, say that she did all of the cooking and caring for them except when she was in the hospital, and that they would be comfortable living with either parent so long as [the children] were [together] in the same house." The court then determined that the best interests of the children would be served by granting sole custody to the plaintiff. It based its determination upon the evidence, including the reports of the advocate for the children and of the family relations officer, and the testimony of Zucker.

The defendant was ordered to pay the plaintiff periodic alimony of $135 per week until her death, remarriage or cohabitation, and lump sum alimony of $6000. The plaintiff was given exclusive use and possession of the marital residence until the youngest child is eighteen years of age. The plaintiff was ordered to make all mortgage, tax and insurance payments on the house. In addition, the court entered certain orders regarding the bill from Zucker, and the current vested accrued

pension and retirement benefits of the defendant with his employer, Louis Dreyfus Corporation. The details of these additional orders are not at issue.

The same court subsequently granted the plaintiff's motion for counsel fees for the children's counsel to be paid 50 percent by the plaintiff and 50 percent by the defendant.

I

General Statutes § 52-146c, pursuant to which Joondeph's testimony was excluded, provides that where any person consults a licensed psychologist for the purpose of securing psychological services, the psychologist shall not disclose, in civil and criminal cases or in preliminary proceedings, "any communication made to [her] by [any] person while [the psychologist] is engaged in the practice of clinical psychology" unless the privilege is waived. The section further provides that in only two situations are such communications not privileged: (1) where they occur during the course of a court ordered examination; and (2) where a party introduces her psychological condition as an element of her claim or defense "*and* the judge finds that it is more important to the interests of justice that the communications be disclosed than that the relationship between the person and the psychologist be protected." (Emphasis added.)[1]

The defendant asserts several bases for his claim that all of Joondeph's testimony should not have been excluded pursuant to that statute. First, he argues that

[1] Section 52-146c has since been revised to render privileged all oral and written communications and records relating to the diagnosis and treatment of a person who consults a psychologist for purposes of that diagnosis and treatment. Privilege now is conferred on all such communications between the individual patient and the psychologist or between a member of such person's family and the psychologist.

at least preliminary testimony by the doctor should have been permitted on the issue of confidentiality under General Statutes § 52-146c in order to supply a foundation for the court's ruling on the plaintiff's motion in limine to exclude testimony of the doctor.

The defendant would have been entitled to an opportunity to present the testimony of this witness as a preliminary matter only if information relevant to the determination of whether § 52-146c applied could have been adduced in such a hearing. The defendant claims that Joondeph's testimony would indicate that there was no confidentiality and that all of the information "was shared with the defendant at the time knowingly, that there were joint sessions between the psychologist, the plaintiff and the defendant discussing their problems and trying to work them out and that there [were] also independent meetings with the children . . . ."

It was undisputed that the parties consulted Joondeph for joint marital counseling, that what began as marital counseling quickly evolved into psychological treatment of the plaintiff, that after the parties' first few joint sessions with Joondeph, she recommended that the plaintiff voluntarily enter a psychiatric hospital, that the plaintiff followed her advice, that Joondeph shared information with the defendant and, on the basis of releases signed by the plaintiff, shared information with counsel and family relations. The defendant does not dispute that Joondeph's communications with the defendant about the plaintiff were in the course of her evaluation and treatment of the plaintiff's condition.

In the hearing on the motion in limine, the only dispute about the application of § 52-146c related to the defendant's conclusions that the joint counseling sessions attended by the parties and the releases of information executed by the plaintiff to counsel and family

relations destroyed confidentiality. The facts, which the defendant claimed amounted to waiver by the plaintiff of any privilege, were all before the court. Thus, the proposed preliminary testimony would have added no facts that would be necessary to the court's ruling on the motion in limine to exclude all of Joondeph's testimony. Although the court could have held a more expansive hearing, it could properly decide the motion without such a further hearing.

The defendant next argues that at least that portion of the information disclosed by the plaintiff in Joondeph's sessions with the plaintiff prior to the filing of the dissolution action should have been admitted. The rationale for this argument is that the purpose of those sessions, and of any disclosures made during them, was marital counseling rather than psychological counseling and that those disclosures are, therefore, not privileged under § 52-146c. The defendant claims that any allegedly confidential communications were not made by the plaintiff while the psychologist was "engaged in the practice of clinical psychology."

The trial court found that the communications between the plaintiff and Joondeph in their sessions could not be separated into marital counseling or psychological counseling. The court also found that the defendant failed to offer any authority that would suggest that even if such a dichotomy could be drawn, it would have any meaning with respect to the applicability of § 52-146c.

In the absence of any statute or case law that is precisely on point, General Statutes § 46b-53, while not directly applicable, sheds light on the issue of privilege for marital counseling by a psychologist from a public policy perspective. That statute provides that where either spouse or counsel for a minor child so requests and a motion for conciliation is made, the parties shall

be ordered to participate in conciliation procedures, prior to the continuation of dissolution proceedings, with a conciliator who shall be a clergyman, physician, domestic relations officer or person experienced in marriage counseling. All such communications are *absolutely privileged* except that the conciliator must report whether the parties attended. General Statutes § 46b-53 (c).

The public policy underlying this statute in general and the latter provision in particular must, in part, have been intended to encourage marital reconciliation by providing a safe, confidential setting in which problems as well as possible solutions could be explored fully and honestly. It would make no sense, in light of that provision, to divide visits to a psychologist in a case such as this into marital counseling versus psychological counseling and assign privileged status to the latter but not the former. Moreover, it is worth noting that § 52-146c was revised in 1990 to confer the privilege on communications between the psychologist and any family member of the patient.

The defendant also argues that even if the confidentiality statute would have rendered the plaintiff's communications with Joondeph privileged, the plaintiff's execution of signed releases for information about her evaluation and treatment to both counsel and to family relations officers, and her allowing Zucker to testify concerning her treatment, destroyed any claim of confidentiality with respect to her treatment.

Section 52-146c limits the disclosure of communications that fall within it to those specified and mandates that confidences be kept unless excepted under the statute. Where an examination by a particular psychologist is ordered by the court, the psychologist-patient privilege is not preserved. Nor is it preserved where a person introduces his psychological condition as an

element of his claim and the judge finds that it is more important that the communication be revealed than that the patient-psychologist relationship be honored. General Statutes § 52-146c (c).

The defendant claims that the plaintiff put her mental health in issue by calling Zucker to the stand, thereby nullifying the statutory privilege. It was the defendant himself who sought the introduction of the family relations report. It was that report that made an issue of the plaintiff's mental health and that entitled the plaintiff to introduce the testimony of her own expert, Zucker, to rebut it.

Furthermore, even if the plaintiff did put her mental health in issue, that fact alone would not render the otherwise privileged testimony admissible. To result in a waiver of the privilege, § 52-146c requires that, *in addition* to a party having put her own mental health in issue, the court must have made a finding that "it is more important to the interests of justice that the communications be disclosed than that the relationship between the person and the psychologist be protected." The statute, however, does *not* require that the court make some finding on this question. The burden is, therefore, on the party seeking to establish that the testimony is admissible to persuade the court to make a finding that justice requires its admission. In this case, the court made no such finding and, in fact, specifically found that the most appropriate evaluation to consider in the award of custody was the recent one by Zucker rather than that done by Joondeph. It therefore seems clear that the court had determined that justice did not require that the privilege be overridden in this instance to permit the introduction of Joondeph's testimony. On the basis of our review of the entire record, we conclude that the court could reasonably have made that determination. Therefore, we do not reach the claim

of the defendant that the plaintiff put her mental health in issue by including the testimony of Zucker or by seeking custody of her children. The unanswered question of *Bieluch* v. *Bieluch,* 190 Conn. 813, 819, 462 A.2d 1060 (1983), therefore, remains unanswered.

If no exception is provided under the statute, privileged communications can be disclosed only if the privilege is waived. See *State* v. *Toste,* 178 Conn. 626, 424 A.2d 293 (1979). Generally, any such waiver "must be the intelligent relinquishment of a known right. A necessary element to waiver is the requisite knowledge of the right and a waiver presupposes a full knowledge of an existing right or privilege and something done designedly or knowingly to relinquish it." Id., 629–30.

The *Toste* standard for determining the existence of waiver of the privilege should be applied here. In this case, each of the several releases executed was limited to a specific person or agency for a specific purpose. The very fact that a release to each of those individuals was deemed needed indicates that the releases to the others did not constitute general waivers, but were, as the plaintiff claims, limited releases. If the plaintiff believed each waiver was limited, it could only reasonably be concluded that no general waiver was intelligently executed by her. We, therefore, hold that the psychologist-patient privilege in this case was not waived by the limited releases the plaintiff executed.

The defendant also argues that his presence at some of the counseling sessions destroyed any privilege to which the plaintiff would otherwise have been entitled. While it is true that where a disclosure to a physician is made "publicly and freely" in the presence of a third person that communication is generally not considered privileged, the presence of a third person is not a waiver if that person is present to aid the patient. The presence of a third person for that purpose does not dem-

onstrate the patient's intent to renounce the secrecy to which she is statutorily entitled. See 81 Am. Jur. 2d, Witnesses § 234. An implied or express waiver of the privilege cannot occur unless it is the *intelligent* waiver of a known right, implying the existence of a patient's active decision or consent to waive her privilege.

In the present case, the plaintiff's disclosures to Joondeph in the presence of the defendant, to whom the plaintiff was then married, cannot reasonably be said to be public and free disclosure evincing an intent to waive confidentiality. We conclude that the defendant's presence did not destroy confidentiality.

The defendant's claim that the testimony of Joondeph should have been admitted because her mental health was automatically at issue under §§ 46b-81 and 46b-82 is also unavailing. While it is true that the plaintiff's health, like that of the defendant, is automatically in issue under §§ 46b-81 and 46b-82, those sections do not either specifically or implicitly override the provisions of § 52-146c. Rather, as is the general rule in construing statutes that appear to be in conflict, we read them, whenever possible, so as to give effect to both. In this case, this is easily done.

Although information about an individual's mental health may indeed be relevant to the award of alimony and the distribution of property, as it surely is to the award of custody, the sources of information are limited by the provisions of § 52-146c. Here, the court appropriately ordered a psychiatric examination of the plaintiff to be conducted by a psychiatrist of the defendant's choice. Had the defendant made arrangements for such an examination in compliance with that order, the plaintiff's communications with that psychiatrist would not have been privileged. The provisions of §§ 46b-81 and 46b-82 do not, however, render the plaintiff's privilege unavailable in her communications with Joondeph.

We conclude that sufficient undisputed facts were before the court for it to conclude properly that Joondeph should not have been allowed to testify about her sessions with the plaintiff, with the plaintiff and the defendant or with their children because the plaintiff's communications to Joondeph were privileged and the plaintiff had not waived that privilege.

## II

The defendant next claims that the trial court incorrectly overruled an existing court order providing the defendant the right to an independent psychiatric examination of the plaintiff and to a continuation of the trial for the presentation of the testimony of the examining psychiatrist. After considerable discussion by counsel before the court as to whether the plaintiff should be ordered to submit to reexamination by psychologist Joondeph, the trial court, *Bassick, J.*, on June 6, 1989, issued a pretrial order for a psychiatric examination of the plaintiff. In issuing the order, the court stated, "I am going to order that such examination shall be performed by a psychiatrist of the defendant's choosing, in the area, and at the defendant's expense."

The defendant did not arrange for such examination by a psychiatrist, but instead arranged for psychologist Joondeph to examine the plaintiff at the plaintiff's home on August 2, 1989, less than a week before trial was to begin. On the basis of the wording of the pretrial order, the plaintiff's attorney refused to allow the plaintiff to meet with Joondeph. When the parties again appeared before Judge Bassick on August 7, 1989, the court reiterated in unmistakably clear language its earlier order that a psychiatric examination, not a psychological examination, be undertaken. The court specified that the examination was to be by a psychiatrist and that it was not to be done by Joondeph or by any

one connected with either the case or the plaintiff. The court instructed the defendant that "arrangements should be made when you first start before Judge Driscoll tomorrow, to indicate to her that the matter will have to be continued to a subsequent date for purposes of the testimony of the psychiatrist selected by the defendant only."

On August 10, 1989, the last day of the trial before Judge Driscoll, after the defendant had rested, the defense requested the continuance for the psychiatric examination that had been ordered by Judge Bassick. Judge Driscoll noted that the defendant had the opportunity from June 6 to August 10 to obtain a psychiatric evaluation of the plaintiff. When informed of the defendant's unsuccessful attempt to have the plaintiff examined in her own home by Joondeph, the court noted: "Well, that is scarcely in accordance with the order." The court stated that the defendant "had the opportunity to get an independent evaluation and . . . didn't do it" and that Judge Bassick's order was not for a continuance but for the *testimony* of a psychiatrist. Because the defendant had failed even to have an examination begun, the court concluded that the defendant had no such testimony to offer and, therefore, declined to grant any continuance.

In short, the defendant was granted the right to a psychiatric examination on June 2, 1989. That order was restated on August 7, 1989, and the right to a continuance was granted, on the defendant's representation that he wanted an examination to be conducted *during* the trial, so that the *testimony* of the examining psychiatrist could be presented. During the trial before Judge Driscoll, the defendant had no examination scheduled or performed. After the conclusion of the testimony, the defendant requested a continuance so that an *examination* could be conducted. The court's

refusal to continue the trial for that purpose, thus, did not overrule an earlier court's order. Rather, the defendant had waived any right to a continuance based on the August 7, 1989 order.

A trial court has broad discretion over matters that occur in the course of trial. We do not disturb its decisions except where that discretion is abused and a litigant is manifestly injured. *Pisel* v. *Stamford Hospital*, 180 Conn. 314, 322, 430 A.2d 1 (1980). In light of the two months in which the defendant had, but failed to avail himself of, the opportunity to have the plaintiff examined and of the fact that testimony both supportive of and adverse to the plaintiff's qualifications as a parent was presented—the former by Zucker, the psychiatrist who most recently evaluated the plaintiff, and the latter by the testimony and report of the family relations caseworker, we conclude that the court properly used its discretion in refusing to continue the trial.

### III

The defendant also argues that the court incorrectly awarded sole custody of the two minor children to the plaintiff. This argument is based on his claims that the custody order was predicated solely on the needs of the plaintiff rather than on those of the children, that the court failed to assess the effect of a male acquaintance of the plaintiff on the children, that it incorrectly found that this male acquaintance apparently did not reciprocate the plaintiff's avowed love for him, that it improperly dismissed the family services report because it relied on an incorrect date for the report and that the court incorrectly relied on *Emerick* v. *Emerick*, 5 Conn. App. 649, 502 A.2d 933 (1985), cert. dismissed, 200 Conn. 804, 510 A.2d 192 (1986), in holding that it could not grant joint custody.

The court did not, as the defendant alleges, award sole custody to the plaintiff only on the basis of the

plaintiff's needs. The court, in its memorandum of decision, considered a number of factors indicating the appropriateness of granting custody to the plaintiff. Those factors were the testimony of Zucker that, in his opinion, "the plaintiff is presently capable of taking care of the children," the fact that the plaintiff obtained a job assisting a handicapped child in a school, "indicating her ability to operate independently," and enabling her "to get home just before or just after her children do from school," the court's belief that the report by Zucker was the appropriate one on which to rely because it was the most recent evaluation; the defendant's absence from the home since the initiation of the divorce, except for eating and sleeping, leaving the children and house totally in the plaintiff's care; and the apparent insensitivity of the defendant toward his wife and children as shown by the fact that he called the police to the home several times in order to "make a record" when disputes with his wife arose without regard to its effect on his wife and children. We conclude that the court did, in fact, properly consider the best interests of the children in its award of sole custody to the plaintiff.

The defendant's allegation that the court erred by failing to consider the effect of the male acquaintance on the children is apparently based on the defendant's claim that the court was incorrect in its memorandum of decision in determining that the man did not reciprocate the plaintiff's feelings for him. The defendant vaguely refers to "significant potential harm" that the man poses to the children, but offers no factual support for that concern. Whether the plaintiff's affections were reciprocated, the court found that the only contact the male acquaintance had had with the plaintiff at the time of trial, except for the period when he performed the initial work at the parties' home, had been by mail or phone. Whether the acquaintance recipro-

cated the plaintiff's feelings is irrelevant and, based on the other facts, could not have been an important element in a determination of the best interests of the children.

The defendant claims that the court misperceived the date of the family relations report. Its date was not the basis upon which the court determined that the report by Zucker was the more appropriate one to consider. Rather, it was the fact that the family relations caseworker relied heavily on the earlier reports from Rye Psychiatric Hospital and Joondeph, and had failed to speak with Zucker or to get what the caseworker herself considered adequate information from either Zucker himself or his report.

The defendant claims that the court was incorrect in awarding sole custody of the children to the plaintiff because he alleges that the plaintiff did not request sole custody. The plaintiff requested in her complaint "custody of the minor children." We interpret that to be a request for sole, rather than joint, custody. Later, in her posttrial memorandum, the plaintiff again asked for sole physical custody but modified her request to seek joint legal custody. The defendant requested sole custody and did not request joint custody.

The trial court stated in its memorandum of decision that because the defendant had not requested joint custody, granting joint custody would fly in the face of *Emerick* unless the court could conclude that joint custody was in the best interests of the children. The court decided that it could not reach such a conclusion. *Emerick* held that it was error to award joint custody in the absence of either an agreement between the parties to joint custody or a motion for conciliation by one of the parties where one of them has moved for joint custody.

The court here properly determined that it could not grant joint custody in the absence of either an agree-

ment to joint custody or a motion for conciliation by one of them. It, therefore, had no choice but to award sole custody and it determined that the best interests of the children would be served by awarding sole custody to the plaintiff.

## IV

Finally, the defendant claims that the trial court erred in making its financial awards. He complains that the court made those awards without the submission by the plaintiff of a complete and properly sworn affidavit, that the court considered gross income rather than net income and failed to consider the tax consequences of its awards for the parties, that its award of income disproportionately favored the plaintiff, that the award of attorney's fees in the judgment improperly relied upon a bill submitted posttrial when no evidence of attorney's fees was submitted at trial, that the defendant lacks the funds to pay the amount that has been ordered and that the court, in its judgment, ignored the prior grant of attorney's fees to the defendant.

The court, in refusing to strike the plaintiff's affidavit, concluded that a prior financial statement had been sworn to and signed. Although Practice Book § 463 provides that parties to a dissolution "shall file" sworn financial statements, it also provides that "[n]otwithstanding the above, the court may render pendente lite and permanent orders, including judgment, in the absence of the opposing party's sworn statement." Thus, it was not improper for the court to render judgments for financial awards even if the plaintiff had not submitted a sworn financial affidavit, as long as the court had other evidence of the plaintiff's financial condition. See Sachs v. Sachs, 22 Conn. App. 410, 419–20, 578 A.2d 649 (1990).

The defendant complains that the court considered only his gross income, and not his net income, as required. The transcript reveals, however, that the court, in fact, had before it information as to the net income of the defendant because it had available information from the defendant's W-2 forms and from his own tax preparation business. On our review of the transcript, we find no indication that the court relied solely on the defendant's gross income and ignored his net income in making its financial awards.

The defendant fails to cite any statutory or case law for his insinuation that the court was required to consider, in any particular manner, the tax consequences of its awards, nor does he cite anything in the memorandum of decision to indicate that the court failed to consider those consequences. The very fact that all home tax deductions and tax exemptions for both children were specifically allocated to the plaintiff is evidence that the court did take those consequences into account.

The defendant claims that the court's property distribution, which he calculates will give the plaintiff at the time of sale in 1993, two-thirds of the equity in the home and only one-third to the defendant after taxes, was so disproportionate that it was erroneous. Even if the defendant's calculations are correct, the award is not per se an abuse of discretion. *Damon* v. *Damon,* 23 Conn. App. 111, 579 A.2d 124 (1990). "The court has a duty to shape its orders so that the family, especially those who are economically at risk, are given protection." *Sweet* v. *Sweet,* 190 Conn. 657, 664, 462 A.2d 1031 (1983). The court here considered all of the statutory factors. It stated in its memorandum of decision that "[i]t is apparent that the defendant's ability to acquire future assets is much greater than that of the plaintiff given not only his employment but his educa-

tion. It is also apparent that the plaintiff's needs are greater than the defendant's because of her lack of education and the nature of the employment in which she is engaged and for which she is qualified." Given the wide latitude accorded the court in distributing assets in a dissolution; *Szilagyi* v. *Szilagyi,* 3 Conn. App. 25, 28, 484 A.2d 469 (1984), the award in this case was within the court's discretion. *Lombardi* v. *Lombardi,* 5 Conn. App. 147, 149, 497 A.2d 52 (1985).

The defendant's argument that the court improperly relied on a bill submitted by the plaintiff to the court posttrial in its award of $10,000 in attorney's fees to the plaintiff must also fail. " '[C]ourts may rely on their general knowledge of what has occurred at the proceedings before them to supply evidence in support of an award of attorney's fees.' " *Guaranty Bank & Trust Co.* v. *Dowling,* 4 Conn. App. 376, 386, 494 A.2d 1216, cert. denied, 197 Conn. 808, 499 A.2d 58 (1985); *O & G Industries* v. *Mizzoni,* 23 Conn. App. 19, 578 A.2d 672 (1990).

The defendant also cannot prevail on his argument that he lacks the funds to pay the court's award because, on the basis of the memorandum of decision, it is clear that the court, in making its awards, considered the assets available to the defendant.

Last, the defendant claims that the court improperly ignored a June 7, 1989 order of a prior trial court awarding $250 in attorney's fees to the defendant, but postponing the payment until final disposition of the case. The trial court had that June 7 order before it. On the basis of the plaintiff's limited assets, the court could have determined that the prior trial court did not make its order final and that its order was to be reviewed at the time of the judgment of dissolution. If the payment order were to be executed upon disso-

lution, the plaintiff would be required to forego a portion of her other awards in order to satisfy that potential obligation, thereby undermining the court's mosaic of financial orders. See *Holley* v. *Holley,* 194 Conn. 25, 34–35, 478 A.2d 1000 (1984).

The judgment is affirmed.

In this opinion LAVERY, J., concurred.

FOTI, J., dissenting. I must respectfully disagree with the view of the majority sustaining the court's granting of the plaintiff's motion in limine, for any one of the three following reasons: (1) the court assumed facts not in evidence in ruling on the plaintiff's motion; (2) the plaintiff's psychological condition was first introduced by her own claim; and (3) the releases that were signed by the plaintiff waived any psychologist-patient privilege that may have existed.

I

On August 9, 1989, after the plaintiff presented witnesses and concluded her case, she filed, served on the defendant's counsel without prior notice, and was granted, a motion in limine by which the testimony of psychologist Wendy Joondeph was ordered excluded as subject to the confidentiality privilege of General Statutes § 52-146c (b).[1] Joondeph was not subpoenaed, but was present in court and prepared to testify. She was not allowed to testify, however, even for the limited purpose of the motion in limine.

In order to grant the motion in limine, § 52-146c (b) mandates that the court find certain essential facts. In the present case it was necessary for the trial court

---

[1] The majority correctly analyzes General Statutes § 52-146c (b) as applied by the trial court on August 9, 1989. We recognize that the 1989 General Assembly amended this section and, effective October 1, 1989, there is no longer a requirement that the party claiming the privilege of confidentiality prove that the psychologist practices in the area of clinical psychology.

to find that Joondeph was, during the time in question, a licensed psychologist, that she practiced in the area of clinical psychology, and that the plaintiff consulted her for the purpose of securing psychological services. The parties did not stipulate to these facts and the court heard no evidence on the plaintiff's motion. The court therefore had to rely on the evidence presented in the plaintiff's case-in-chief to establish any facts found.

A review of the record discloses that the plaintiff's case consisted of the testimony of three witnesses, a psychiatrist, David Zucker, the plaintiff and the defendant. None testified, nor were they competent to testify, as to whether Joondeph was a licensed psychologist, practicing in the area of clinical psychology, when the plaintiff consulted her. Although Zucker labeled Joondeph a "psychologist who is apparently in private practice in the Rye area," he indicated clearly that his knowledge of that "fact" was gleaned "from her letterhead." The record clearly shows that all counsel were unsure of Joondeph's credentials in that they referred to her alternately as a "psychologist," a "psychiatrist" or a "marriage counselor."

It should also be noted that the defendant's counsel pointed out that Joondeph saw the defendant and the children independently and acted as their counselor. For this fact alone, she should have been allowed to testify at least as to the relationship between the children and the plaintiff as well as between the children and the defendant. Testimony on this point would not have been a breach of confidentiality, if any existed. The plaintiff's counsel asked for an offer of proof as to whom Joondeph had treated, but the court refused to allow this evidence in for any purpose. An offer of proof by the defendant, sought by the plaintiff, may have easily clarified this point.

When asked if she had gone to Joondeph for anything to do with her own emotional or mental condition, the plaintiff testified, "No. I didn't go in to see her for that purpose. It was more for counseling because that was what [the defendant] wanted."

I respectfully submit that the record before us indicates that Joondeph's qualifications were never accurately established, that she had assisted and counseled the family in different capacities at different times and that some of this counseling was beyond the scope of confidentiality as defined in § 52-146c (b). The court could not make the necessary findings to grant the motion in limine in the absence of a stipulation by the parties or an evidentiary hearing. The record fails to establish evidence sufficient to support the trial court's finding. See, e.g., *Richard* v. *Richard,* 23 Conn. App. 58, 63, 579 A.2d 110 (1990).

Even assuming arguendo that the court somehow could have found that Joondeph was a licensed psychologist, without Joondeph's testimony it could not find that she was practicing in the area of clinical psychology during that period of time when the plaintiff was consulting with her absent Joondeph's testimony.

II

Second, the court, in granting the plaintiff's motion in limine, found that the plaintiff had not introduced her mental condition as a defense[2] and therefore had not waived the privilege under § 52-146c (c) (2). That statute, as pertinent, provides: "Relevant communications under this section shall not be privileged . . .

___

[2] The court stated: "Here, as counsel pointed out, the introduction [of the psychological condition of the plaintiff as testified to by Zucker], in a sense, was not made by the plaintiff. The testimony was produced, in effect, as *anticipating a defense.* I think that falls within this—That does not fall within the provisions of this section. I will therefore grant the motion in limine." (Emphasis added.)

(2) if . . . a person introduces [her] psychological condition as an element of [her] *claim* or defense . . . ." (Emphasis added.) In this case, the plaintiff's claim was that she was in a psychological condition suitable to be awarded custody of the children.

The court found that "the defendant had originally retained [Joondeph] for *marriage counseling"* (emphasis added) and that "[t]he preoccupation of the plaintiff with [a young man who had installed vinyl siding on the house] resulted in the defendant asking her to go to counseling in which the defendant participated. In February, the counselor, who is a psychologist, recommended that the plaintiff be hospitalized. It appears that during this period the plaintiff's behavior was somewhat unusual. The children told the family relations officer that their mother was often in bed and did not prepare meals and that [one of the children] or her father prepared the dinner meal." The plaintiff was admitted, voluntarily, to the Rye Psychiatric Hospital, where she remained for two weeks. She was then out of the hospital for two weeks, but returned, voluntarily, for a three month stay. The court also found that following her discharge "she engaged in outpatient therapy with the psychologist who had originally treated her and continued in it for some three months when she decided to stop it." The court never found, however, at what point "marriage counseling" ended and "treatment" began.

In excluding Joondeph's testimony in its entirety, the court excluded not only those communications that occurred during the three months of treatment when perhaps Joondeph was a licensed psychologist practicing in the area of clinical psychology, but it also excluded all of the testimony she may have offered that concerned her services as a "marriage counselor" to both parties. Joondeph's testimony should have been

permitted to clarify this crucial role differentiation that is an element necessary for a finding of a confidential relationship under § 52-146c. The court did not hear Joondeph's testimony as to whether, after the plaintiff was released from the hospital, Joondeph was acting as a marriage counselor with the ultimate goal of saving the parties' marriage or whether she was acting as a clinical psychologist who was treating the plaintiff for a psychological condition. Because the defendant continued to participate in the sessions, both his and the plaintiff's understanding of the nature of the treatment is relevant. Joondeph's purpose and intent in those same sessions, however, was of equal relevance. Before the trial court could determine whether § 52-146c applied, it was essential for the court to know what only Joondeph could offer, i.e., whether it was her aim to treat the parties individually or as a unit, and whether her ultimate goal was to preserve the plaintiff's psychological stability, or whether it was to determine and act upon the stability of the marriage. The defendant's counsel sought to produce this evidence at the motion in limine, but it was not allowed to do so.

"The statute provides a privilege for confidential communications so that a patient may safely disclose to [her] therapist personal information that is necessary for effective treatment or diagnosis. *State* v. *White,* 169 Conn. 223, 234–35, 363 A.2d 143, cert. denied, 423 U.S. 1025, 96 S. Ct. 469, 46 L. Ed. 2d 399 (1975). Communications that bear no relationship to the purpose for which the privilege was enacted do not obtain shelter under the statute and are admissible subject to the normal rules of evidence." *Bieluch* v. *Bieluch,* 190 Conn. 813, 819, 462 A.2d 1060 (1983).

The plaintiff's witness, Zucker, a Fairfield psychiatrist, was called according to the plaintiff's coun-

sel, "to refute the opinions and conclusions of the custody study as to the plaintiff's mental condition which had been introduced into the trial when the custody study was admitted into evidence by the court" pursuant to Practice Book § 479.[3]

Zucker testified that the plaintiff suffered, in the past, from depression and an adjustment disorder of adult life. He stated that this was caused by feelings of guilt and discomfort that were rooted in religious conviction. Zucker stated that he would not totally agree with the diagnosis of Elliott Singer, a psychiatrist connected with the Rye Psychiatric Institute, or of Joondeph, that the plaintiff suffered from a schizoaffective disorder, and, he stated that he doubted that the plaintiff had ever exhibited psychotic symptoms, a necessary predicate to the schizoaffective disorder diagnosis. He did acknowledge that the plaintiff had a dependent personality.

Zucker was allowed to testify as to conversations he had with both Joondeph and Singer and he was allowed to refer to reports of both of these doctors. Neither Joondeph nor Singer, however, could testify. While Zucker did not disagree with the "psychotic or fantasy relationship diagnosis" made by Singer at the Rye Psychiatric Hospital in 1987 for the plaintiff, he referred to it as a "cross-sectional diagnosis" or that it perhaps should have been called a "tentative diagnosis of schizoaffective disorder."

It should also be noted that Zucker never asked the plaintiff about the exorcism that she performed on her daughter in 1987. Zucker knew about it through Singer's conversation and notes. Although the plaintiff had never mentioned this to him, Zucker did ask

[3] The report was actually offered into evidence by the defendant's counsel during his cross-examination of Zucker, although the report had been ordered by the court and was in the court clerk's file.

the parties' daughter about an alleged slapping of her brother by the plaintiff. He also asked the plaintiff about an episode when the brother called the police because the plaintiff was attacking her husband.

Zucker ultimately indicated that there was a possibility of psychiatric problems recurring because "[i]f my impression is that this is a stress reaction brought on by a bad marriage and the stress incurred and by her own guilt, then my diagnosis becomes either a brief reactive psychosis or schizophrenia form illness; either of which [is] time limited."

The obvious purpose of Zucker's testimony was to establish the plaintiff's claim that she was of sound mind and to present evidence of the plaintiff's psychological condition that would enable the court to award her custody of the children, contrary to the recommendations made by the extensive custody study submitted by the family relations division of the Superior Court. Her claim was that she was emotionally and mentally fit, contrary to the study's conclusion that she had paranoid delusions, crossed between reality and fantasy concerning an imagined love between herself and a young construction worker, coupled with depression, high agitation, agoraphobia, and suicidal tendencies.

While the plaintiff had the opportunity to present evidence that she was psychologically fit, the defendant was not given the opportunity to show, by available and competent evidence, that the plaintiff was not psychologically fit for purposes of custody.[4] The plaintiff was

---

[4] The defendant's counsel stated: "Also, she quite clearly has introduced her health as an issue through the calling of Dr. Zucker, whether that was as a defense or as an offense. It is irrelevant. Her health is very critical under the alimony and assignment area. I find it inconceivable that it is not extremely important for custody and visitation."

Our Supreme Court in *Bieluch* v. *Bieluch,* 190 Conn. 813, 819–20, 462 A.2d 1060 (1983), specifically did not answer the question whether a par-

allowed to discredit a great deal of the family relations custody report, but the defendant was not allowed to present evidence to support that report.

The family relations report was not sealed as a court exhibit.[5] It does not create a presumption to be rebutted nor a prima facie case. It is merely an aid to the court that the court is free to accept or to reject. The plaintiff, through Zucker, clearly introduced her psychological condition, even though the question of that psychological condition was initiated by the court ordered family relations custody study. The court should have gone on to determine whether it was "more important to the interests of justice that the communications be disclosed than the relationship between the person and psychologist be protected." General Statutes § 52-146c (c) (2).

### III

Finally, the plaintiff supplied several general releases, that were prepared by counsel, to both family relations officers and counsel for the defendant, thereby waiving any psychologist-patient privilege, if any in fact did exist.

It might reasonably be argued that when the plaintiff executed releases allowing the family relations officer access to the details of her treatment with Joondeph, these releases were for the limited purpose of preparing the child custody report that had been ordered by the court, and that the plaintiff could still

ent seeking custody introduces his "mental condition as an element of his claim or defense" so as to waive the privilege.

[5] Since the family relations custody report was made an exhibit and not sealed, it is available to the news media and the general public, and its contents, including any "privileged" communications between the plaintiff and Singer and the plaintiff and Joondeph, cannot reasonably be expected to have continued confidentiality.

have expected continued confidentiality. Such a claim, however, cannot be made as to the consent form that was given to the defendant's counsel. This release did not limit the purpose for which it was given, nor did it contain a reservation allowing the plaintiff to withdraw it at any time.

Waiver is the intentional relinquishment of a known right. *Goldenberg* v. *Corporate Air, Inc.,* 189 Conn. 504, 510, 457 A.2d 296 (1983). The plaintiff could not reasonably have expected continued confidentiality once she intentionally relinquished her right. Once he received the written waiver, counsel for the defendant was free to use that form in any legal way for the best interest of his client. It is axiomatic that privileged communications that are disclosed are no longer privileged. For example, as the plaintiff conceded during oral argument before this court, a communication that may have been privileged, to the effect that the plaintiff had performed an exorcism on one of her children, no longer could be so classified because the defendant's counsel, through the plaintiff's unlimited release, had obtained and used that information during cross-examination in open court. The defendant was free to disseminate that information, or any other communication, in various ways making such known to the general public.

Accordingly, for any one of the reasons given, I would reverse.