[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff husband, Clifford Gienau, commenced this action for a dissolution of the parties' marriage on the ground of irretrievable breakdown by complaint returnable October 12, 1993. He also sought custody of their minor child, support, an assignment of property and other relief. The defendant wife, Anita Gienau, filed an answer admitting the allegations of the complaint and a cross complaint, also seeking a dissolution on the ground of irretrievable breakdown. She also seeks custody of the minor child, support, alimony and other relief, as on file.
At trial, both parties were represented by counsel and testified. A number of documentary materials were introduced into evidence and financial affidavits and a child support guidelines worksheet were submitted. The parties also filed written proposed orders and claims for relief and submitted Plaintiff's Exhibit E, which deals with the disposition of certain tangible personal property. CT Page 8734
From the evidence, the court finds the following facts.
The wife, whose birth name was Anita Louise Muise, married the husband at Mystic, Connecticut, April 24, 1965. Both parties have resided continuously in this state for at least one year before the filing of the complaint on September 24, 1993. The parties have one minor child issue of the marriage, Casey Mathew Gienau, whose date of birth is July 26, 1977. No other minor children were born to the wife since the date of the marriage, except for Timothy Gienau and Christopher Gienau; both older sons have reached their majority. Neither spouse nor the minor child are recipients of public assistance. All statutory stays have expired, and this court has jurisdiction.
The husband is 48 years old, a high school graduate and in good physical health; however, he is depressed. He was employed throughout the marriage in the beginning as a machinist, now as an assembly supervisor for Maxson Automatic Machinery Company, for whom he has worked for the past 23 years. He earns $644 per week gross from his employment and $273 per week gross from rental income from a two-family home owned by the parties; he nets, after taxes and other deductions, $585 per week.[1] At times he has worked a second job. His mental condition does not appear to impair his ability to work.
His job benefits include health insurance, a 401K plan and a vested pension benefit which would provide him with $470 per month at age 65. He has woodworking, electrical and plumbing skills and has crafted custom furniture for sale. He also operated a blacksmith forge.
The wife is also 48 years of age and a high school graduate. She is in good physical health, but experiences nervousness and anxiety attacks. She is under the care of a psychiatrist and takes prescribed medication daily. She was the primary caregiver to the children and homemaker during the marriage and worked part time from time to time. She now does clerical work at Storer Cable, where she has worked since March, 1994, full time. She earns $304 per week gross and $238 per week net. Her job has health insurance benefits and a 401K plan which will vest at the end of one year. Her prior job was at a local bank where she worked as a teller for about three years. For about two years, about 1985-1987, she worked in, and managed the parties' photography development business, which ultimately failed. She CT Page 8735 has bookkeeping and clerical skills, and her mental condition has not seriously impaired her ability to function at her job, nor has it caused her to miss work from her job. She also has been able to tend to her household without significant difficulty.
This marriage of over 29 years' duration became greatly troubled after the birth of the parties' youngest child. The couple disagreed greatly about child discipline; the husband was a stern taskmaster and disciplinarian, the wife lenient and forgiving. This was a major bone of contention and remained unresolved, even after counseling.
Another cause of their unhappy differences was the handling of the family finances by the wife. The parties were in debt from time to time and had various bills in arrears, including real estate taxes. Their federal income tax returns were not filed for a number of years, causing refunds to evaporate, leaving a residue of obligations. The husband finally took over responsibility for the financial chores, wondering where their money went. The wife claimed there simply was not enough to meet their regular expenses, although the husband worked a lot of overtime, and she conceded he was a good provider.
The husband also was not outwardly affectionate, and neither would communicate with the other and tell the other candidly what was on their minds or about their inner personal relationships and other important issues. The parties' sexual relationship foundered and was unsatisfactory. The wife was unhappy and began an affair with another man, who was the plaintiff's best friend, which the plaintiff discovered. When he confronted her with it, she admitted it.
Despite substantial counseling, the parties' relationship did not improve. The parties have damaged themselves and each other both emotionally and financially.
The plaintiff left the home; he later came back, and left again; he slept in a separate room, and the parties finally separated several years after he discovered the affair. The wife remains in the marital home, obtained sole custody pendente lite of their now 17 year old son, and still maintains the relationship with the other man. He provides her and the parties' minor child with cash and other gifts on occasion.
On this evidence, I find that the marriage has broken down CT Page 8736 irretrievably. What is surprising is that neither party concedes any blame for it, each entirely blames the other. The marriage was in great difficulty, but the court cannot say it was destroyed until the coup de grace was administered by the wife's affair. This, the court finds, was a substantial contributing factor to the breakdown of the marriage. Thus, I find that while both spouses bear responsibility for its destruction, the wife must shoulder a greater share of the burden.
At the outset of trial, the husband sought a joint legal and physical custodial order "providing that the child choose his primary physical residence"[2] He also sought orders relating to decision making. No investigation was made by the Family Services office nor was an attorney appointed to represent the child. The parties have not agreed upon joint custody (in fact, the evidence reveals that the father's relationship with the son is very poor, and they see each other infrequently); nor was a proper motion for joint custody made by the plaintiff pursuant to General Statutes § 46b-56a(c).[3] The plaintiff's claim for relief is not "a motion duly made" Even if it may be considered a motion, it was not timely made, as it would have required the court to order the parties to submit to conciliation; in turn, this would have delayed the trial and be impractical considering the age of the child. Accordingly, the court cannot award joint custody under the posture of this case. See Emerick v. Emerick, 5 Conn. App. 649 (1985); cert. dismissed,200 Conn. 804 (1986). Also see Tabackman v. Tabackman, 25 Conn. App. 366
(1991); Cabrera v. Cabrera, 23 Conn. App. 330, cert. denied, 216 Conn. 828 (1990). Moreover, under the circumstances of this case, as the child's preference appears to be to live with his mother, the court declines to order joint custody.
As noted, sole custody of the parties' son was awarded to the mother, pendente lite. The evidence indicates that the parties are not able to communicate concerning their son's best interests. His much needed counseling was terminated by the mother due to lack of funds. No effort was made to enlist the father in the effort to restore counseling, nor did the father volunteer to do so. On this record, the plaintiff simply has not shown that a modification of the sole custody order is justified and that a joint custody order is workable. The court, however, did order the parties to participate in the "Parenting Education Program," so called, pursuant to 1993 Public Acts, No. 93-319, and further suggested to the father at the close of evidence, but did not order, that he and the mother cooperate in obtaining CT Page 8737 counseling for their son to help improve the father-son relationship.
The parties have two substantial assets: their jointly-owned marital home, 16 Aimee Drive, Pawcatuck, Connecticut (Stonington), which the court finds has a value of $140,000, less a mortgage of $84,000 and a lien of $1,800 for a water treatment system, leaving a net equity of $54,200; and a two-family home,1-3 Wilford Court, Stonington, Connecticut, which the court finds has a value of $80,000 and is mortgage free.
They purchased the two-family home in the early 1970's for $11,000[4] with a borrowed down payment of $3,000 and a mortgage. The family lived in one dwelling unit and rented the other. The husband made substantial renovations to the property, and during the years the parties have rented it, they had minimal vacancies.
About 1976, they moved to the Aimee Drive home, having purchased it for $40,000, with a down payment of $8,000 and a $32,000 mortgage. The husband made significant renovations and improvements to this house, also. The wife assisted him in substantially enhancing the property.
In 1991, the Aimee Drive property was refinanced, and a new mortgage of $85,000 was placed on it. After payment of the existing first mortgages on the Aimee Drive and the Wilford Court properties, closing costs and $13,277 to settle a lawsuit, they derived net proceeds of $29,879. The evidence on the disposition of these funds was vague and undocumented, but the court finds that most went for other household renovations, past due taxes, credit card bills and the purchase of a van.
The wife received a settlement in a personal injury case, from which she had about $20,000 on deposit during 1988. Apart from $7,500 she lost when she used it to secure a son's car loan upon which he defaulted, the accounting for the balance was similarly undocumented; the wife testified she paid past due bills arising from the parties' photo business in cash. She did not use checks because she was reluctant to disclose the past due bills to her husband.
None of these funds are left, and besides the two pieces of real estate, the parties have modest assets which include: their tangible personal property; their motor vehicles, each of which CT Page 8738 have substantial loans; the wife's thrift plan of $945 and $100 in cash on deposit in banks. The husband has $1,325 on deposit in banks and a 401K plan worth $560. He also has a vested pension which as stated will provide him with $470 per month at age 65.
The husband holds the sum of $10,532 in a savings account as custodian under the Connecticut Uniform Gift to Minors Act for his son, Casey. The defendant declared the interest from this account on his own income tax return and testified that the funds belonged to his own father.
Against those assets, the wife reports $9,078 in liabilities on her financial affidavit, which includes $3,000 in attorney's fees; the husband $11,603, which includes the $1,800 lien on the Aimee Drive home for water treatment. Greatly adding to the woes of this marriage was the husband's ill-fated venture into the photo development business over the objections of the wife. Despite her opposition, she devoted a lot of time to the business working in it full time for more than one year. When the business was forced to close and they were evicted, they were saddled with bills and lost their initial investment. In addition to other monies paid out by them, they were required to pay the $13,277 from the 1991 mortgage refinance in settlement of a lawsuit brought by a business creditor plus attorney's fees.
The court finds that the husband's monetary contributions to the acquisition, preservation and appreciation in value of the marital assets was greater than those of the wife; and the wife's non-monetary contributions were greater than those of the husband.
The court also finds that the husband has greater employability, earning capacity earnings vocational skills and a greater opportunity to acquire capital assets and income in the future than the wife.
The court will not address the question of ownership of the bank account held by the husband as custodian for the son. The son is not a party to this case, and the wife has not shown the funds are the property of the defendant. The court leaves her and the minor child to any remedies they may have under the Connecticut Uniform Gift to Minors Act, General Statutes §45a-546, et seq. CT Page 8739
The court has considered all of the factors in General Statutes §§ 46b-62, 46b-81, 46b-82 and 46b-84 in the light of the evidence. The court has also considered the income tax implications of its financial awards.
Accordingly, judgment may enter dissolving the marriage of the parties on the ground of irretrievable breakdown, together with orders as follows:
(1) Sole custody of the minor child, Casey, is granted to the wife, subject to reasonable rights of visitation in the husband.
(2) The plaintiff shall pay to the defendant as child support the sum of $142 per week which is the sum suggested by the child support guidelines. The child support shall be secured by a contingent wage garnishment, and the parties shall be subject to the provisions of 1994 Public Acts, No. 94-61(b). The plaintiff shall have the dependency exemption for state and federal income tax purposes on account of the child. The plaintiff shall maintain health insurance for the child through his employment, subject to General Statutes § 46b-84(c). The parties shall each pay one-half of the expenses unreimbursed or uncovered by such insurance.
(4) The defendant shall take, have and own, free and clear of the claims of the plaintiff all right, title and interest in and to the following property: the dwelling known as No. 16 Aimee Drive (Pawcatuck) Stonington, Connecticut, subject to the first mortgage thereon, and her 1992 Chevrolet automobile subject to the loan thereon, both of which obligations she shall pay and save the plaintiff harmless therefrom; her bank accounts; the tangible personal property set out to her on Plaintiff's Exhibit E; her thrift plan of $945 and her Primerica life insurance policy.
(5) The plaintiff shall take, have and own, free and clear of the claims of the defendant (except as set forth later) all right, title and interest in and to the following property: the two-family dwelling known as No. 1-3 Wilford Court, (Pawcatuck) Stonington, Connecticut, and all rentals accruing therefrom; his 1993 Pontiac automobile, subject to the loan thereon which he shall pay and save the defendant harmless therefrom; the tangible personal property set out to him on Plaintiff's Exhibit E; his bank accounts of $1,325; his 401K plan, his pension and the life CT Page 8740 insurance policies shown on his affidavit; excepting the wife shall be the irrevocable beneficiary of the $40,000 Travelers policy until her death or remarriage, whichever first occurs.
(6) The plaintiff shall have the food processor, braided rug, the dining room table and matching chairs at issue. The defendant wife shall have the microwave VCR dresser and lawn tractor.
(7) The plaintiff shall execute and deliver a promissory note in the amount of $7,200 secured by a mortgage on the Wilford Court property. Said note shall be payable without interest in equal monthly payments of $400 commencing September 15, 1994 and on the 15th of each month thereafter until paid Said note shall provide for default if any instalment is not paid within fifteen (15) days of the due date, acceleration of the unpaid balance in the event of default or transfer of the mortgaged premises; and interest on the unpaid balance at the rate of six (6%) percent per annum and for attorney's fees in the event of default.
(8) The plaintiff shall pay to the defendant periodic alimony in the amount of $40 per week until the death of either party, the remarriage of the wife or pursuant to General Statutes §46b-86(b), or ten years from this date; the alimony shall not be modifiable as to term. The court believes that alimony should not be paid beyond this period because of the wife's ability to earn income and become self sufficient and because of the part she played in the breakdown or, the marriage.
(9) The plaintiff shall pay toward the defendant's counsel fees the sum of $500, in equal monthly payments of $50 commencing October 1, 1994. A denial of counsel fees in toto would undermine the other financial awards set out.
(10) Each party shall pay the liabilities shown on schedule 3 of their respective financial affidavits, except that each shall pay one-half of the health care bills for Casey.
(11) With respect to personal property, the parties have agreed to sell those shown on Plaintiff's Exhibit E. The plaintiff shall have ninety (90) days from the date of this decree to sell them; the terms, conditions and prices of such sales shall be at his discretion. He may go upon the marital premises and have use of the sheds (excluding the home itself) upon reasonable notice at reasonable times to show the items and for the sale itself. The net proceeds of the sales after CT Page 8741 deducting the reasonable expenses thereof, including advertising, etc., shall be shared, and the plaintiff shall furnish the defendant with an accounting within ten days after the sale. Any items not sold within said date shall be removed by the plaintiff and sold elsewhere under the provisions of this order; any items not so removed shall become the property of the defendant.
(12) All documents of title and other instruments necessary or incidental to the effectuation of these orders shall be executed and exchanged by the parties within thirty (30) days of this decree.
Teller, J.