[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] RULING RE: MOTION FOR COMMISSION (#117) AND OBJECTION TO MOTION FOR COMMISSION AND MOTION FOR PROTECTIVE ORDER (#118)
In her "amended and restated complaint" (4/15/96), plaintiff alleges that Gary E. Savill, Ph.D., a licensed clinical psychologist, negligently treated her for a condition described as a dissociative identity disorder (also referred to as a multiple personality disorder). She also alleges that Gary E. Savill acted as an agent or employee of the corporate defendant, was duly authorized to so act for the corporation, and acted within the scope of his agency and/or employment.
More specifically, the compliant alleges that in June 1991, when plaintiff agreed to engage in psychological counseling with Dr. Savill, arrangements were made to meet with him twice a week, on Mondays and Saturdays; plaintiff alleges that Dr. Savill negligently treated her and failed to adhere to accepted standards of clinical and psychological care in that he: (a) regularly took non-crisis calls during the therapy sessions; (b) regularly made non-crisis calls to his family members during the therapy sessions; (c) was routinely late in beginning appointments with plaintiff, usually starting the sessions ten to CT Page 14504 fifteen minutes after the start time; (d) forgot or failed to show up for several scheduled therapy sessions with plaintiff; (e) frequently changed appointment times on short notice, and to unusual or inconvenient times; (f) often changed the frequency, or scheduling, of the meetings due to his personal or family needs, rather than the clinical needs of plaintiff; (g) failed to recognize and discuss relevant issues regarding the plaintiffs condition that he knew or should have known needed to be treated as part of proper clinical therapy for a multiple personality disorder; (h) failed to refer plaintiff to another clinician of appropriate expertise when he was unable to meet plaintiffs therapeutic needs; (i) failed to maintain adequate and appropriate written records regarding plaintiffs treatment; (j) used hypnosis on plaintiff in an inappropriate and unprofessional manner; (k) failed to maintain appropriate psychological boundaries in the course of his treatment of plaintiff; and, (l) failed to use the degree of skill and diligence in his treatment of plaintiff as would be used by, or expected of, a competent clinical psychologist.
Plaintiff alleges that as a result of defendant's negligence, her psychological condition deteriorated requiring longer more intensified psychological therapy. Further, that defendant's negligence resulted in a self-inflicted wound causing pain and suffering, hospitalization, medical costs, and other expenses for additional medical care and treatment. Plaintiff also alleges emotional pain and suffering; incurrence of financial expenses for hospitalization, medication, and medical care; and an inability to engage in many of life's activities.
There has been extensive discovery in this case. In support of her claim, plaintiff has disclosed two experts, both of whom are clinical psychologists, and both whom have been deposed: Dr. David Sakheim and Dr. Robin Grant-Hall. Through discovery, it was ascertained that before and during the time Dr. Savill was providing professional psychological services to plaintiff; she was also receiving "spiritual counseling" from a Father Bernard Bush, a Roman Catholic priest, who currently resides at the Jesuit Retreat House, Los Altos, California.[1]
Defendant has filed a motion for an order commissioning a Los Altos, California law firm to take the deposition of Father Bush.[2] See: General Statutes 52-148c(b). In response to the motion for commission, plaintiff filed an objection which includes a request for a protective order that defendant be CT Page 14505 precluded "from any further inquiries into the spiritual counseling provided [plaintiff] by Father Bush, whether at her deposition or the deposition of any other person." The objection and the request for a protective order are predicated on General Statutes Sec. 52-146b, which provides: "A clergyman, priest, minister, rabbi or practitioner of any religious denomination accredited by the religious body to which he belongs who is settled in the work of the ministry shall not disclose confidential communications made to him in his professional capacity in any civil or criminal case or proceedings preliminary thereto . . . unless the person making the confidential communication waives such privilege . . ."[3]
The court conducted a hearing on the motion for commission and plaintiffs objection and request for a protective order. At the hearing, defendants filed an objection to the motion for a protective order, which objection was essentially a legal memorandum with argument and cited authorities. At the hearing, counsel for defendants referred to a number of materials which were neither part of the available record nor contained in the official court file; accordingly, the court requested that additional documentation be filed with the clerk. On August 6, 1999, defendants filed their Supplemental Memorandum In Support Of Objection to Plaintiffs Motion for Protective Order (dated 8/5/99) which contained extensive legal argument and twelve attached exhibits.[4]
 I.
Connecticut has recognized by statutory enactment the privilege accorded confidential communications to clergymen. General Statutes Sec. 52-146b. It has been held in this jurisdiction that the privilege protects both the clergy person and the communicant from being compelled to reveal confidential communications made to the clergy person by the communicant.Rosado v. Roman Catholic Diocesan Corp. , Superior Court, judicial district of Fairfield, Docket No. 302072 (June 2, 1995). "As a matter of common law . . . confidential communications made by or to a member of the clergy in his or her religious capacity are privileged from disclosure whether that disclosure is sought from the member of the clergy from whom solace, counsel or spiritual guidance is sought or from the person seeking the religious solace, counsel or guidance." Rosado v. Roman Catholic DiocesanCorp. , supra.[5]
CT Page 14506
On the information before the court, it appears that plaintiff has consistently maintained that her contact with Father Bush was for spiritual counseling and guidance ("spiritualness", and "trying to get back to religion and . . . God," and "on a spiritual basis . . . a spiritual issue for abuse victims."), and that her concurrent contact with licensed psychologists, including defendant, was for psychological counseling.[6] Whether the meetings with Father Bush were inappropriate from the standpoint of a clinical psychologist, or might have impacted negatively on the efficacy of the therapy provided by Dr. Savill, does not remove the Father Bush sessions from the realm of spiritual counseling or guidance.[7] It is not clearly ascertainable from the information presented whether the contact with Father Bush involved communications of a penitent or a confessor to the clergyman; however, the privilege is not specifically limited to a confessor form of communication, but rather, in the language of the statute, extends to any "confidential communications made to [the clergyman] in his professional capacity." As stated in Rosado, "confidential communications . . . are privileged whether . . . disclosure is sought from the member of the clergy from whom solace, counsel, or spiritual guidance is sought, or from the person seeking thereligious solace, counsel, or guidance. (Emphasis added). Rosadov. Roman Catholic Diocesan Corp. , supra. It appears to the court that plaintiff did confer with Father Bush for spiritual guidance and counseling.
There is no claim that Father Bush was not a priest/clergyman at the time of the counseling sessions. The information provided the court refers to Father Bush as a Roman Catholic priest, in the Norwich Diocese, at a parish-school type facility. Plaintiff traveled to Norwich weekly to confer with the priest. According to plaintiff, there was no remuneration paid to the clergyman, he never asked for any money, he never requested that any charitable contributions or donations be made to him or on his behalf; and none were made. Thus, it would appear that in counseling plaintiff, Father Bush was a clergyman acting in his professional capacity. Therefore, the privilege, unless waived, would shield communications to and by Father Bush from disclosure.
 II.
Defendants claim the plaintiff implicitly waived the privilege by placing her contact with Father Bush "at issue" in this case. No cases have been cited, or otherwise brought to the CT Page 14507 court's attention, which establish or discuss an "at issue or implied waiver exception" to the clergyman/penitent privilege. With respect to the attorney-client privilege, the implied waiver principle applies only when "a party specifically pleads reliance on an attorney's advice as an element of a claim or defense, voluntarily testifies regarding portions of the attorney-client communication, or specifically places at issue, in some other manner, the attorney-client relationship. Metropolitan Life Ins.Co. v. Aetna Casualty Surety Co., 249 Conn. 36, 52-53, ___ A.2d ___ (1999). Here, plaintiff is not relying on her communications with Father Bush to support the cause of action against the defendants. Thus, in my view, plaintiff has not made the communications with the clergyman "integral" to the outcome of her claim, or "an element" of the claim alleged. Therefore, she has not waived the claim, implicitly, merely by bringing the malpractice claim as it is alleged in her complaint. Furthermore, plaintiffs mere acknowledgment of communications with Father Bush would not constitute an implicit waiver of the privilege; she did not voluntarily testify regarding, or reveal, specific communications with the clergyman, but has consistently asserted, through counsel, that the communications were privileged. While plaintiffs experts, when deposed, expressed negative opinions regarding Father Bush, his methods of spiritual counseling, and its impact on psychological therapy, that circumstance, in my view, does not provide a basis for concluding that plaintiff has implicitly waived, or has placed in issue, her confidential communications with Bush.
Defendants maintain that Father Bush's involvement is relevant to both the issue of liability and damages. As stated inMetropolitan Life, "merely because the communications are relevant does not place them at issue."
 III.
Defendants claim a waiver of the privilege premised on the following: (1) during the course of treatment with Dr. Savill, plaintiff discussed her contact with Father Bush; (2) there was a three-way telephone conference call among the defendant, Father Bush, and plaintiff; (3) plaintiff discussed her contact with Father Bush with her treating psychologist, Dr. David Sakheim; (4) plaintiff discussed her contact with Father Bush with a lay person, Nancy Kruger; and (5) plaintiff met with Father Bush in the presence of her spouse, Keith Reardon, and Nancy Kruger. On this basis, defendants claim that "any `privilege' that may have CT Page 14508 attached to the plaintiffs relationship with Father Bush was waived and destroyed by the plaintiff's own actions."
"If no exception is provided under the statute, privileged communications can be disclosed only if the privilege is waived."Cabrera v. Cabrera, 23 Conn. App. 330, 340 (1990). "Generally, any such waiver `must be the intelligent relinquishment of a known right. A necessary element to waiver is the requisite knowledge of the right and a waiver presupposes a full knowledge of an existing right or privilege and something done designedly or knowingly to relinquish it." Cabrera v. Cabrera, supra, (citing State v. Toste, 178 Conn. 626, 629-30, 424 A.2d 293
(1970).
The information provided the court indicates that the layperson, Nancy Kruger, was introduced to plaintiff by Father Bush. In a few conversations, plaintiff and Ms. Kruger discussed one another's backgrounds; Ms. Kruger was also an abuse victim and wanted plaintiff to know "that she was there for me if I ever wanted to talk or needed someone to talk to." Ms. Kruger had also been diagnosed with a multiple personality disorder, treated with Dr. Sakheim, had the same general type of background as plaintiff, and was "seeing Father Bush in spiritual advisor-type sessions." Ms. Kruger knew Father Bush before plaintiff met him. Plaintiff discussed her "contact" with Father Bush with Nancy Kruger, "[b]asically just from one Roman Catholic to another, you know, both of us trying to find our way back to God and the church." Nancy Kruger was present, along with plaintiffs spouse, Keith, at a weekly session with Father Bush.
There is no specific information that plaintiff revealed communications between herself and Father Bush to Nancy Kruger. Merely discussing one's contact with a spiritual advisor with a person also counseling with that advisor does not constitute, in my view, a waiver of the confidentiality afforded by law to the priest/penitent relationship. Regarding the presence of Ms. Kruger and plaintiffs husband at a Bush counseling session, it seems to me that a reasonable inference can be drawn that they were present in a support capacity. As stated in Cabrera, "[w]hile it is true that where a disclosure to a physician is made `publicly and freely' in the presence of a third person that communication is generally not considered privileged, the presence of a third person is not a waiver if the person is present to aid the patient." 23 Conn. App. at p. 340. The Cabrera
decision dealt with the psychologist/patient privilege, and with CT Page 14509 respect to the presence of a spouse, states: "plaintiffs disclosures to [the psychologist] in the presence of the defendant, to whom the plaintiff was then married, cannot reasonably be said to be public and free disclosure evidencing an intent to waive confidentiality." Id. at p. 341. In Bendowski v.Quinnipiac College, 1995 Ct. Sup. 14459, New Haven Judicial District at Meriden, 12/26/95, a friend was present at the time an alleged sexual assault victim communicated with a counselor; in upholding the confidentiality of the communication(s), the court stated: "the essence of the Cabrera holding was that where the third person is present for the purpose of providing aid to the person seeking counseling, then the privilege is not destroyed."
Similarly, where the person in therapy discusses with the psychologist/therapist concurrent or ongoing spiritual counseling with a clergyman, such does not, in my view, demonstrate an intent to renounce the secrecy of the penitent/clergyman relationship to which that person is statutorily entitled. Under such circumstances, it cannot reasonably be viewed as a "public and free disclosure evidencing an intent to waive confidentiality." 23 Conn. App. at p. 341. I reach a similar conclusion with respect to the three way telephone call: the three way telephone call, during which plaintiff maintains she said virtually nothing, which became quite heated between Father Bush and Dr. Savill (her treating psychologist), which concerned at least in part the subject of theology, and which ended with Dr. Saville saying that he too had a degree in theology, and hanging up, did not constitute a waiver by plaintiff respecting privileged communications made during her spiritual guidance sessions with the clergyman.
 IV.
On the basis of the aforesaid, defendants' motion for commission (#117) is denied and, plaintiffs objection thereto issustained.
A protective order is entered barring questions during depositions of plaintiff, and her husband Keith Reardon, as to what plaintiff said to Bush or what he said to her in the "spiritual counseling" sessions. This protective order pertainsonly to pretrial depositions of plaintiff and her husband, and is not intended to be binding on the trial judge in any respect, or to limit, in any way, that court's right to vacate the order at CT Page 14510 any time, modify it, and to fully determine the permissible areas of inquiry either before a trial actually begins or, of course, during trial.
Mulcahy, J.