[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON PLAINTIFF'S POST JUDGMENT MOTION FOR CONTEMPT (DATED AUGUST 14, 2001), DEFENDANT'S POST JUDGMENT MOTION FOR MODIFICATION (MOTION NO. 111) AND DEFENDANT'S POST JUDGMENT MOTION FOR CONTEMPT (DATED SEPTEMBER 26, 2001)
The court has for consideration three motions: the plaintiff's post judgment motion for contempt brought on by an Order to Show Cause dated August 14, 2001, the defendant's post judgment motion for modification brought on by an Order to Show Cause dated September 26, 2001, and served upon plaintiff's counsel on October 2, 2001, and defendant's post judgment motion for contempt dated September 14, 2001.
The court grants the plaintiff's post judgment motion for contempt, grants the defendant's post judgment motion for modification and denies the defendant's post judgment motion for contempt.
The marriage of the parties was dissolved before the Honorable Romeo Petroni on March 9, 1994. The parties executed a Separation Agreement dated the same date, which Agreement was presented to the court, approved by the court and its provisions incorporated in the judgment.
The parties were married in November, 1983. There are three children issue of the marriage: Michael born November 24, 1983, Conner born May 5, 1987, and Grady born January 2, 1991.
Article IV of the Agreement provides as follows:
 4.1 Commencing on the date of dissolution, the Husband shall pay to the Wife as unallocated alimony and support the sum of Seven Thousand ($7,000.00) Dollars per month.
 4.2 In addition to the payment called for in paragraph 4.1 above the Husband agrees to pay to the Wife during each calendar year as additional unallocated alimony and support the following sums:
 (a) Thirty (30%) percent of any gross income in excess of One Hundred Fifty Thousand ($150,000.00) Dollars but less than Two Hundred Thousand ($200,000.00) Dollars.
(b) Twenty (20%) percent of any gross income in excess of Two Hundred Thousand ($200,000.00) Dollars but less than Tow (sic) Hundred Fifty Thousand ($250,000.00) Dollars. CT Page 4883
 (c) Ten (10%) percent of any gross income in excess of Two Hundred Fifty Thousand ($250,000.00) Dollars but less than Three Hundred Thousand ($300,000.00) Dollars.
 At such time as the Husband's gross income totals $300,000.00 in any given calendar year, this provision shall have no further force and effect and any gross income in excess of Three Hundred Thousand ($300,000.00) Dollars shall be the sole property of the Husband.
 4.3 The Wife agrees that any gross income received by the Husband in excess of Three Hundred ($300,000.00) Dollars in a calendar year shall not be deemed a substantial change of circumstances and she will not seek to modify the alimony and support provided in Paragraph 4.1 and 4.1 of this agreement, it being the intention of the parties that the alimony and support provisions cannot be modified as to amount in excess of $114,000.00 per year.
 4.4 The Husband agrees that neither the emancipation of any of the children of the marriage or any income earned by the Wife regardless of the amount shall be deemed a substantial change in circumstances for which he can seek a modification of the unallocated alimony and support order.
 4.5 The payments provided in Subparagraphs 4.1 and 4.2 shall be made by the Husband until the first of the following events occurs: the death of either party, the remarriage of the Wife, or July 1, 2008. The payments provided in Subparagraphs 4.1 and 4.2 shall be non-modifiable as to term.
Paragraph 4.9 of the Agreement provides as follows:
The Husband shall provide the Wife with copies of all of his Federal and State income tax returns, W-2 forms and K-1's by April 30 of each year. Except as provided herein the Wife shall not attempt to obtain financial information concerning the Husband except by court order. If the financial information supplied by the Husband is substantially incorrect, then the Husband shall pay all costs and expenses, including but not limited to reasonable attorney's and accountant's fees, required to obtain the correct financial information.
 PLAINTIFF'S MOTION FOR CONTEMPT POST-JUDGMENT
The defendant failed to provide the plaintiff with copies of all of his Federal and State Income Tax Returns, W-2 forms, 1099 forms and K-1 in accordance with the terms of the Agreement and the judgment. Such failure CT Page 4884 on the defendant's part was willful. The defendant's defense is that the plaintiff never asked for this documentation. It was not the plaintiff's obligation to request this information, but rather, the defendant's obligation to supply the documents by April 30 of each year in accordance with the terms of Article 4.9. The court finds the defendant in contempt for failure to comply with this provision of the Agreement.
The plaintiff has also set forth two other bases for her motion for contempt:
1. The defendant has refused and failed to make payments in full of his support and alimony obligations as set forth in Article 4.1; and,
2. The defendant has failed to pay additional support as provided in Article 4.2 of the Agreement.
The court finds that the defendant has failed to make payments in full of his support and alimony obligations and finds, further, that the defendant has failed to pay any additional support as provided in Article 4.2 of the Agreement and finds further that such failure on his part was intentional and willful. The court finds, therefore, that the defendant is in contempt as alleged in the plaintiff's motion. The court will subsequently find the arrearage on paragraph 2a and 2c of plaintiff's motion.
As may be noted in the provisions of the Agreement recited above, the term "gross income" was used by the parties in paragraph 4.2 and 4.3 of Article IV of the Agreement. Gross income is defined in Title 26 Section 6.1 of the Internal Revenue Code as
 ". . . all income from whatever source derived including (but not limited to the following: (1) Compensation for services, including fees, commissions, fringe benefits, and similar items;
(2) Gross income derived from business;
(3) Gains derived from dealings in property;
(4) Interest;
(5) Rents;
(6) Royalties;
(7) Dividends . . .; CT Page 4885
(11) Pensions;
(12) Income from discharge of indebtedness;
(13) Distributive share of partnership gross income . . .;"
Counsel for the defendant has argued that "gross income" should not include capital gains and distributions from retirement accounts. The term "gross income" is defined under the Child Support and Arrearage Guidelines Regulations in Section 46b-215a-1 (11) as follows: "Gross Income means the average weekly earned and unearned income from all sources before deductions, including but not limited to the items listed in subparagraph (A) of this subdivision but excluding the items listed in subparagraph (B) of this subdivision." The items listed in subparagraph (A) do not include capital gain income nor withdrawals from retirement accounts.
Plaintiff has set forth a number of valid arguments for including capital gains in gross income. A review of the entire Agreement clearly indicates that nothing was to be excluded in computing gross income. The provisions of paragraph 4.9 recited above requires that the defendant provide copies of his Federal and State Income Tax Returns, W-2 forms, 1099 forms and K-1's by April 30 of each year. It is clear from this requirement that more than wages and self-employment income was contemplated in computing "gross income." Form 1099's provide information on interest, dividends, stocks and land sales as well as all miscellaneous income. Form K-1's provide information on trust and partnership income as well as gains or losses from partnership interests.
The defendant, on the other hand, has presented a valid argument for the exclusion of withdrawals from retirement accounts in the calculation of "gross income." He points out that withdrawals from retirement accounts can be characterized as involving a reduction or dissipation of assets, even though they are included as taxable income. He argues that it makes no sense to interpret the term "gross income" as including a reduction of assets which are then taxed and, in the case of retirement withdrawals, penalized for premature withdrawal.
There have been three decisions of our courts involving the definition of gross income. The case of Logan v. Logan, 186 Conn. 592 (1982) involved an agreement with a sliding scale of increased alimony based upon a percentage of the husband's "gross annual income." However, this term was defined in the agreement so that it did not present the question with which we are concerned where there is no definition of the term in the agreement. The case of Simms v. Simms, 25 Conn. App. 231 (1991) also involved an agreement where the term "gross income" was used. One might CT Page 4886 argue that capital gain income should not be considered part of "gross income" and cite the Simms case. The situation in the Simms case is not present in this case and the case is clearly distinguishable. There is one case, however, decided by Judge Dranginis in Litchfield in 1994 in which she ruled in a case not unlike the case here that the term "gross income" as used in an agreement included capital gains and rental income. Hartv. Hart, 9 CSCR 355 (1994). For purposes of this case, the court holds that capital gains are included in "gross income" for the purposes of determining defendant's alimony obligation but that withdrawals from retirement accounts are not included in "gross income."
The defendant paid $7,000 per month in accordance with the Agreement through June, 2001. For the months of July, August and September, he paid $4,000 per month. There is an arrearage, therefore, of $9,000 plus the defendant's "excess" earnings in calendar years 1996, 1997, and 2000 set forth by plaintiff in her
Memorandum of Law as follows:
 "1996 159,940 — 150,000 9,940 x 30% 2,982 1997 286,610 — 150,000 50,000 x 30% 15,000 286,610 — 200,000 50,000 x 20% 10,000 286,610 — 250,000 36,610 x 10% 3,661 1998 0 1999 0 2000 156,802 — 150,000 6,802 x 30% 2,040.60 --------- $33,683.60"
The court finds an arrearage to October 2, 2001 (the date of service of the defendant's motion for modification) of $42,683.60. The defendant shall pay such arrearage and purge himself of the court's finding of contempt by paying the arrearage as hereinafter set forth.
 DEFENDANT'S MOTION FOR MODIFICATION POST-JUDGMENT
The defendant has moved pursuant to § 46b-86 (a) of the General Statutes for modification of the orders of alimony and support. The movant must prove there has been a substantial change in his or her circumstances. The defendant was terminated at his employment with Wexford Partners Fund on September 18, 2001.
A brief history of the parties is important at this point. The plaintiff is 45 years of age. She is employed on a part time basis as a nursery school teacher in the Westport-Weston school system. She has had two years of college following high school. She stopped working in 1981 CT Page 4887 to become a housekeeper and to take care of the children. She resides in Weston where she has resided since moving from the Soundview Farm Road in Weston, the home she was living in at the time of the dissolution. Her health is good. She earns $184 per week and receives $150 per week in tax free bond income. Two of the children reside with her. Connor is now a freshman at Weston High School and Grady is a fifth grader in Weston elementary school. The oldest child, Michael, is over the age of eighteen and residing with his father in Milford. He is a freshman in Middlebury College in Vermont. The children have had all their education in the Weston school system, and the plaintiff believes Weston offers the best public school education in the area. The youngest child, Grady, has a learning disability and is in a special education program. The plaintiff wishes to remain in Weston. Since the defendant's reduction in the alimony and support order, she has had to sell one of her $30,000 State Municipal Bonds.
At the time of dissolution, the parties divided their assets equally except that the defendant's retirement account was divided $525,000 to him and $325,000 to the plaintiff. Plaintiff's account is presently $539,000 and her municipal bond account is now $130,000. Her total assets are $881,000 of which $182,000 is the equity in her home.
The defendant is 47 years of age, also in good health and, as previously indicated, resides in Milford. The defendant is a security trader, a broker-dealer primarily in New York City. While his employment terminated on September 18, the slump in market conditions in the Nasdaq market precipitated his termination. He was unemployed the first half of 2001. In June, he began his employment with Wexler Management — a hedge fund in Stamford, Connecticut. As his counsel has argued, the defendant is a "gambler, a speculator, and a crap shooter." When times are good, he has a large income. His income for the year 1997 was $286,000 and for the year 1998 $512,000. On the other hand, for the period 1998 to 2000 he was unemployed a total of 15 months. He has had a number of different employments since the parties' dissolution. However, he has never voluntarily left employment. There was always a shift in the market or a shift in market conditions. He is living currently on savings and withdrawals from retirement funds. He has made numerous efforts for employment. He has contacted 15-25 firms in Connecticut and New York City. (See Defendant's Exhibit 4 for a list of his current contacts.) The defendant states he is seeking a job that pays over $500,000 per year. He states that he needs a job of at least $350,000 per year. (See defendant's Hypothetical Scenarios in Defendant's Exhibit 3.)
The court finds that by reason of the defendant's present unemployment there has been a substantial change in his financial circumstances. The plaintiff argues for a modification based upon the defendant's earning CT Page 4888 capacity. Most often such awards are based upon the unwillingness of the defendant to find employment. See Miller v. Miller, 181 Conn. 610, 611-12
(1980); Hart v. Hart, 19 Conn. App. 91, 94 (1989)
This is not the case in this instance. The court has the duty to shape its orders so that those who are economically at risk are given protection. Sweet v. Sweet, 190 Conn. 657 (1983); Cabrera v. Cabrera,23 Conn. App. 330 (1990). The plaintiff and the two children residing with her are economically at risk. The court grants the motion for modification and reduces the order for unallocated alimony and support to $4,000 per month effective October 2, 2001. The defendant shall notify the plaintiff within two (2) days of his obtaining employment and shall advise the amount of his earnings, the amount of any deductions for federal and state withholding and all other deductions. The arrearage for the period of October through April ($7,000 assuming the defendant has continued to pay $3,000 per month during this period) together with the arrearage found on the motion for contempt shall be paid $25,000 on or before May 15, 2002 and thereafter at the rate of $1,250 per month until fully paid. These payments shall be paid by the defendant to purge himself of his contempt.
 DEFENDANT'S MOTION FOR CONTEMPT POST-JUDGMENT
The defendant has moved that the plaintiff be found in contempt for failure to make a gift from jointly owned Chase Bank Certificates of Deposit to a trust fund for the benefit of the minor child Grady pursuant to the provisions of Paragraph 7.2 of the Agreement. The motion further alleges that the plaintiff has failed to comply with the provisions of paragraph 7.2 and is obligated to Grady's account in the sum of $70,000 through the calendar year 2001.
Paragraph 7.2 of the Agreement provides as follows:
 7.2 The Husband shall transfer his Chase CD, which has a current value of approximately $95,000.00 to a joint account owned by the Husband and Wife, within one month from the date of dissolution. Thereafter, each party shall make a gift from this joint account in the sum of $10,000.00 per year to Grady's trust fund.
The Agreement requires that each party contribute $10,000 from the joint account established by the Chase Bank CD. The joint account was never established. Neither party has contributed $10,000 per year to Grady's trust. The parties discussed this matter back in 1994 following the court's judgment and agreed that the defendant would handle and invest the boy's trust funds. The requirements of Paragraph 7.2 of the Agreement were never pursued by either party. Defendant's now calling the CT Page 4889 plaintiff's inaction was contemptuous is rather like the pot calling the kettle black.
The court finds no willful and intentional violation of this provision of the Agreement and denies the defendant's post judgment motion for contempt.
 COUNSEL FEES
The plaintiff's attorney has filed an affidavit of counsel fees showing total fees of $10,715 and costs of $710. These fees included those services rendered for presentation of the plaintiff's motion for contempt together with research on the issue of "gross income" as contained in the escalation clause of the Agreement. The affidavit includes plaintiff's counsel's time only to March 21. The plaintiff's extensive brief was dated April 12 so that there would have been additional services rendered after the $10,715 figure.
Paragraph 14.4 of the Agreement provides as follows:
 14.4 In the event that it shall be determined by a court of competent jurisdiction that either party shall have breached any of the provisions of this Agreement or of any court decree incorporating by reference or otherwise this Agreement or portions thereof, the offending party shall pay to the other party reasonable attorney's fees, court costs, and other expenses incurred in the enforcement of the provisions of this Agreement and/or judgment or decree incorporating any or all of the provisions hereof.
The court has found that the defendant has breached several terms of the Agreement. The court also has found the defendant in contempt so that counsel fees may also be awarded pursuant to the provisions of § 46b-87
of the General Statutes. Recognizing that the total fees incurred by the plaintiff are as a result of presentation of her motion for contempt and defense of the defendant's motion for modification, the court awards $7500 as an allowance towards plaintiff's attorney's fees in this matter and orders that such amount shall be paid to plaintiff's counsel on or before May 15, 2002.
 IN SUMMATION
The court finds the defendant in contempt and finds an arrearage of $49,683 to April 30, 2002 (assuming that the defendant has paid $3,000 per month for the period October, 2001 through April, 2002 thus leaving an arrearage of $1,000 for each month from October 1, 2001 to April 30, 2002). To purge himself of contempt, the defendant shall pay to the CT Page 4890 plaintiff $25,000 on or before May 15, 2002 and thereafter the sum of $1,250 per month until fully paid. The defendant shall pay plaintiff's attorney the sum of $7,500 on or before May 15, 2002.
The defendant's motion for modification is granted effective October 2, 2001 and his unallocated alimony and support obligation is reduced to $4,000 per month. The defendant is to notify the plaintiff within two (2) days of his obtaining employment together with the amount of money he will be earning after taxes and all deductions. The defendant's motion for contempt is denied.
 ___________________ EDGAR W. BASSICK, III JUDGE TRIAL REFEREE