STATE OF CONNECTICUT *v.* JOHN PALLADINO
(AC 20940)

Schaller, Flynn and Shea, Js.

Argued September 28, 2001—officially released May 14, 2002

*Jon L. Schoenhorn*, for the appellant (defendant).

*Theresa Anne Ferryman*, assistant state's attorney, with whom, on the brief, was *Kevin T. Kane*, state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, John Palladino, appeals from a judgment of conviction for the crime of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (5).[1] The defendant claims, inter alia,[2] that the trial court violated his sixth amendment right to confront and cross-examine the state's principal witness (complainant) when the court withheld the complainant's psychiatric records despite a full waiver of confidentiality. We agree, and further hold that the state has failed to establish the harmlessness of the violation. Thus, we reverse the judgment of conviction and remand the case for a new trial.

The defendant was a food services supervisor at York Correctional Institution in Niantic when the complainant and defendant first became acquainted. The complainant was assigned to this prison as a pretrial detainee who had been charged with murder. She met the defendant when she was assigned to work in the kitchen, where the defendant was a stockroom supervi-

---

[1] General Statutes § 53a-71 (a) provides that a "person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and . . . (5) such other person is in custody of law or detained in a hospital or other institution and the actor has supervisory or disciplinary authority over such other person . . . ."

[2] The defendant raised four issues on appeal. Because the first issue is dispositive, we need not reach the remaining three.

sor. The complainant was reassigned specifically to work in the stockroom under the defendant's supervision after they "spoke about it and [decided that] it would be easier to pass notes and just basically talk." After she was reassigned to work in the stockroom, the defendant began to have conversations with the complainant that were sexual in nature.

In January, 1998, prison officials interrogated the complainant after hearing that she was pregnant. At that time, she denied any sexual relationship with the defendant in written statements. Pregnancy tests were negative. Prison officials placed her in segregation, locking her in a cell for substantial periods of time, and questioned her further about the once suspected pregnancy. She finally signed a statement on March 8, 1998, in which she stated she had engaged in sexual relations with the defendant on five separate occasions.

The state brought charges of sexual assault in the second degree in violation of § 53a-71 (a) (5) against the defendant. The defendant pleaded not guilty and opted for a jury trial. At trial, the complainant testified as a witness for the state. On cross-examination, she admitted to a past medical diagnosis of multiple personality disorder, but claimed that it was a "misdiagnosis" because the effects of illegal drug abuse combined with facing a lengthy prison term had simply rendered her "completely a mess." On the basis of reports indicating that she was "hearing voices" upon her admission to prison in September, 1997, defense counsel asked her whether she was schizophrenic. To this, the complainant initially adverted to her general explanation that she was "completely a mess." Counsel considered this unresponsive and asked her again whether she remembered hearing voices. The complainant responded, "I don't know," and, "I don't recall." When confronted with a writing to refresh her memory, the complainant admitted, finally, "hearing voices," but again attributed

the phenomenon entirely to being "high" on illegal drugs, even while in prison.

Prior to trial, the defendant subpoenaed warden Eileen Higgins of York Correctional Institution, demanding both her presence on April 6, 2000, and that she bring with her the complainant's "mental health file and records," among other items. On the day to which the warden had been subpoenaed to appear, the attorney general filed a motion to quash the subpoena on her behalf, arguing that "records concerning inmates' mental health treatment are privileged and may not be disclosed without the patient's written consent."

At a hearing concerning the motion to quash, the state agreed that it was in the complainant's best interests to retain her own counsel on the matter of waiving her statutory right to confidentiality in her psychiatric records. Taking the state's suggestion, the court contacted the public defender's office to appoint independent counsel for the complainant on the matter of whether she wished to grant consent through a written waiver for the defendant to access her psychiatric records. Counsel for the state admitted that, as to her medical records, the complainant would be "capable of doing two different types of waiver. . . . One would be that she may have an interest in privacy such that she would want Your Honor to cull out only those matters that the court thinks [are] relevant and, [second] perhaps, she would be open to a complete disclosure." The state took a more restrictive position with respect to her psychiatric records, requesting strict adherence to a procedure delineated in State v. Esposito, 192 Conn. 166, 179–80, 471 A.2d 949 (1984). The state claimed that the complainant could provide only a limited waiver, authorizing only the trial judge to review the records to determine if they contained material useful for impeachment. The defendant opposed this position, stating that "[i]f [the complainant is] will-

ing to give up full waiver of those records, then I believe she is entitled to do that . . . ." The court agreed with the state, holding that "[General Statutes §] 52-146 makes it clear, as does the case law, *D'Ambrosio*,[3] *Esposito* . . . there is a right beyond the right of the person involved as to why there is that privilege . . . . And I think all [the defendant] might be entitled to [would be a] preliminary waiver" authorizing only an in camera inspection of the records by the court. The court also suggested that the complainant's counsel "explain" to the complainant that the consent would include only the in camera inspection.

We first review the circumstances surrounding the complainant's waiving her right to confidentiality of her medical, psychiatric and psychological records. The defendant made it clear from the outset through his counsel that if the complainant "consents," he did not believe there would be "any real need for in camera review." Defense counsel later summarized his position as follows: "If she consents to me having her medical records, I believe they can just be turned over to me." The court then appointed a public defender to advise and represent the complainant about this issue.

After consulting with the complainant, the public defender reported in open court that he had advised her on two issues. He stated: "One dealt with a potential claim for right against self-incrimination, but more importantly it was the issue about medical psychiatric records. I spent about ten or fifteen minutes with her. We're satisfied that she understood what I was talking about. I explained to her that she did have a right to confidentiality. But she indicated to me that she felt comfortable with waiving that right; she felt comfortable with the medical and psychiatric records. And to

---

[3] *State* v. *D'Ambrosio*, 212 Conn. 50, 561 A.2d 422 (1989), cert. denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990).

that end, my office did prepare a waiver of confidentiality. I believe all parties have a copy of it."

The public defender then filed with the court a written waiver signed by the complainant and read it into the record. It read in pertinent part as follows:

"I, [the complainant] . . . hereby waive any confidentiality I may have in any and all of my medical and/ or psychiatric/psychological records so that they may be used in a criminal court case, state versus John Palladino, at the New London judicial district court. I do this freely after consulting with and being advised by Bruce—Attorney Bruce A. Sturman of the office of the public defender. . . ."

We conclude that the complainant, after receiving legal advice, waived the confidential privilege she had to object to the release and use by the defendant of any of her medical, psychological or psychiatric records in the course of the trial in New London Superior Court.

She did not limit the purposes for which these records might be used[4] and therefore the written waiver can be considered a "general waiver." See *Cabrera* v. *Cabrera*, 23 Conn. App. 330, 340, 580 A.2d 1227, cert. denied, 216 Conn. 828, 582 A.2d 205 (1990).

We next consider whether, in light of such a waiver and the pertinent statutes, the court still had some gate-

---

[4] We note that the complainant issued two additional written waivers to the defendant and to the state. These waivers indicated a waiver of "any confidentiality in my psychiatric records that [the trial court] has reviewed and agreed to turn over to" the prosecution or the defense. They apparently were executed after the court determined that it had an independent gatekeeping role even after the person whose records these were agreed to their release. We conclude that her attorney's description of her complete nonopposition to a full release indicates that the full waiver of confidentiality as to all of her records for use in the Superior Court trial, regardless of whether the trial court had decided to relinquish them, indicates the larger scope of her written consent under General Statutes § 52-146e (a). The state has taken no issue with this conclusion in the present appeal and, thus, any such issue is not before us.

keeping role to play in the release of these records. This issue concerns the construction of a statute, and our review of the trial court's conclusions is plenary. *Gartrell* v. *Dept. of Correction*, 259 Conn. 29, 39, 787 A.2d 541 (2002).

The cases that the trial court referenced while refusing to surrender all of the complainant's psychiatric records are factually inapposite to the case at bar because no waiver had occurred in them. In *State* v. *Esposito*, supra, 192 Conn. 179–80, our Supreme Court delineated a procedure designed to safeguard a witness' rights in psychiatric records made confidential by § 52-146e et seq. It was this procedure that the trial court was striving to follow in denying the defendant access to the complainant's records. However, *Esposito* and its progeny have dealt only with situations where the witness had not relinquished the privacy rights to confidentiality governed by § 52-146e, and the issue was joined as to whether a defendant's constitutional right of confrontation under the sixth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut trumped such a statutory privilege. See, e.g., *State* v. *Harris*, 227 Conn. 751, 765–69, 631 A.2d 309 (1993).

Our Supreme Court has determined that an in camera inspection by a trial court of privileged records satisfied the state constitutional confrontation rights of a defendant. See id., 767–68. However, neither our Supreme Court nor this court has held that such an in camera review is necessary where a victim freely gives up any rights to confidentiality that she might otherwise have. See, e.g., *State* v. *Olah*, 60 Conn. App. 350, 353–54, 759 A.2d 548 (2000) ("privileged" material invokes in camera procedure). Indeed, § 52-146e embraces the policy that these rights to confidentiality are personal and may be waived by consent of the individual who enjoys the rights. See General Statutes § 52-146e (a), providing

that the protections are not applicable in the event of "consent of the patient or his authorized representative."

"The people of this state enjoy a broad privilege in the confidentiality of their psychiatric communications and records. See General Statutes §§ 52-146d and 52-146e." *State* v. *Rosado*, 52 Conn. App. 408, 414, 726 A.2d 1177 (1999). They have the statutory right, nonetheless, to waive or give up that right by consent, so long as they do so knowingly, freely and voluntarily. *State* v. *Toste*, 178 Conn. 626, 629–30, 424 A.2d 293 (1979). General Statutes § 52-146d (3) provides that " 'Consent' means consent given in writing by the patient or his authorized representative . . . ." General Statutes § 52-146e (b) provides that any such consent "shall specify to what person or agency the information is to be disclosed and to what use it will be put." The writing which the complainant signed adequately stated that "any and all" of the complainant's medical psychiatric and psychological records could be used in the defendant's Superior Court case in New London, satisfying the statute's requirements for waiver. It is also clear from her attorney's statements made on the subject in open court.

Where the state's complaining witness has freely agreed to the use of her psychiatric records and the court has provided her with counsel who advised her in the matter, we conclude that there is no further initial gatekeeping role for the court. However, insofar as individual questions are subject to some proper objection at trial, the court can properly entertain them as they are made. The court improperly refused to release all of the psychiatric records to the defendant, which he had subpoenaed to court.

Our inquiry turns, therefore, to the impact of the trial court's failure to surrender the psychiatric records to

the defendant. As did our Supreme Court in *State* v. *Slimskey*, 257 Conn. 842, 779 A.2d 723 (2001), in making that impact analysis, we necessarily refer to some of the witness' records to examine how they relate to the complainant's ability to recall and relate back facts truthfully and accurately. We cannot decide the issue in a vacuum. The defendant's claim is that the denial of access to these records violated his constitutional right to confront and cross-examine his accusers. See U.S. Const., amend. VI.[5]

The sixth amendment to the United States constitution, as well as article first, § 8, of the constitution of Connecticut, guarantee "the right of an accused in a criminal prosecution to be confronted with the witnesses against him. . . . The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.* The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct putting of questions and obtaining immediate answers." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Esposito*, supra, 192 Conn. 178–79. "Although the confrontation right is not absolute and is subject to reasonable limitation; *State* v. *Vitale*, 197 Conn. 396, 401, 497 A.2d 956 (1985); there is, nevertheless, a minimum level of cross-examination that must be afforded to the defendant into matters affecting the reliability and credibility of the state's witnesses. *State* v. *Milum*, 197 Conn. 602, 609, 500 A.2d 555 (1985)." *State* v. *Slimskey*, supra, 257 Conn. 858.

The "cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions

---

[5] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him . . . ."

and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness." *Davis* v. *Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). The right of a criminal defendant to impeach an adverse witness is constitutionally guaranteed. "In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Internal quotation marks omitted.) *State* v. *Valentine*, 240 Conn. 395, 407, 692 A.2d 727 (1997).

The reliability of a witness' testimony is impacted by a wide range of issues, including the mental capacity of the witness at a sufficiently relevant time. See generally C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 7.19. "The capacity of a witness to observe, recollect and narrate an occurrence is a proper subject of inquiry on cross-examination. If *as a result of a mental condition* such capacity has been substantially diminished, evidence of that condition before, at and after the occurrence and at the time of the trial, is ordinarily admissible for use by the trier in passing on the credibility of the witness." (Emphasis in original; internal quotation marks omitted.) *State* v. *Cardinal*, 194 Conn. 114, 118–19, 478 A.2d 610 (1984).

Much of the improperly withheld psychiatric materials sought by the defendant in this case, which he had a right to examine, would have enabled him to impeach the reliability of the complainant, the state's principal witness against him. The state observes that the defendant had an opportunity to cross-examine the complainant in the same general area covered by the materials, i.e., the complainant's mental condition. While this point has its appeal, the difference between the cross-examination that was achieved and the cross-examination

that could have been achieved with access to the materials appears to be more critical after our own in camera inspection of the materials.[6]

Armed with the sixteen pages of psychiatric records that the trial court saw fit to turn over, the defendant did foray into the issue of mental incapacity due to diagnoses of schizophrenia, "blackouts" and "multiple personality disorder." The complainant parried these concerns by responding that these diagnoses were incorrect, maintaining that these symptoms were all drug induced and isolated in occurrence. In fact, the complainant at first claimed not even to remember having reported "hearing voices" until her memory was "refreshed" by one page from the materials that were turned over. The complainant explained that she was simply "a complete mess" due to drug abuse and recent incarceration, which led to her "misdiagnosis." In view of materials to which the defendant did have access, pressing further might have been viewed as repetitive, harassment or futile, even if allowed by the court.

With the at least thirty-seven pages of records that were improperly withheld, however, the defendant could have impeached the complainant's superficial explanations. The following are illustrative but not exhaustive of how the defendant's cross-examination was harmed. In a mental health assessment form improperly withheld from the defense, a clinician indicates that the schizophrenia was diagnosed in the patient's history as being "chronic." With this, the defendant would have had a good faith basis to challenge the complainant's claim that the episode of "hearing voices" was an isolated affair, attributable to her recent drug use and incarceration.

---

[6] It should be noted that neither the defendant nor the state has yet viewed these materials, making more fact specific arguments by either party impossible.

Beyond challenging the complainant's explanation of her supposedly isolated diagnoses of schizophrenia, blackouts and multiple personality disorder, the defendant could have explored entirely new areas of mental incapacity had the at least thirty-seven pages been properly turned over. In a mental health assessment form dated September 25, 1997, among thirty-seven pages of documents that were not turned over, a clinician notes "Dissociative Disorder." The clinician then recommends "evaluat[ion of the complainant] for Dissociative Disorder." Nowhere in the materials turned over to the defense was there any such report. In fact, a subsequent notation indicates, "Not placed on clinic list to date." The defendant had no basis to inquire into this disorder on cross-examination without the use of this form. According to the American Psychological Association's Diagnostic and Statistical Manual of Mental Disorders (9th Ed. 2001) p. 477, "The essential feature of the Dissociative Disorders is the disruption in the usually integrated functions of consciousness, memory, identity, or perception of the environment." A "dissociative disorder not otherwise specified is [indicated when there is] a dissociative symptom, but [it does not] meet the criteria for any specific dissociative disorder.[7] Id. It is exactly the witness' memory and perception of her environment on a date very near the time of this report that were at issue on cross-examination. Thus, the defendant was entitled to knowledge of this potential disorder as it possibly affected the reliability of the witness' testimony.

Another mental health screening form withheld from the defendant indicates other medications that the complainant was taking, including "CP2, Prolixin, [and] Cogentin." The latest edition of the Physicians' Desk

[7] Multiple personality disorder is a related, but distinct disorder with more specific symptoms. Diagnostic and Statistical Manual of Mental Disorders, supra, p. 477.

Reference (56th Ed. 2002) states: "Warnings . . . Cogentin may impair mental and/or physical abilities required for the performance of hazardous tasks. . . . Mental confusion and excitement may occur with large dosages, or in susceptible patients. Visual hallucinations have been reported occasionally. Furthermore, in the treatment of . . . patients with mental disorders, occasionally there may be intensification of symptoms." Id., supra, p. 2055. Cross-examination about the dosage and side effects of this drug at the time of the incident, afterward and at trial were not even possible because the defendant did not have this report indicating that it had been administered.

As yet another example, a mental status evaluation form dated March 22, 1999, just days before trial, indicates that the complainant's memory is "impaired" and that her judgment is "fair" rather than "good." In a separate mental health treatment plan dated December 29, 1997, the complainant is reported to have "impaired cognition." Again, the complainant's cognition was at issue on cross-examination, and the defendant could have benefited from this material.

The state suggests a standard of review for the harm related to this error that is applicable to evidentiary rulings by a trial court, namely an abuse of discretion standard.[8] The state considers as dispositive our Supreme Court's determination in *State* v. *Storlazzi*, 191 Conn. 453, 459, 464 A.2d 829 (1983), that the decision to grant or deny access to privileged psychiatric records

---

[8] In its brief, the state contended that "[e]ven if the trial court's reliance on a societal interest in the confidentiality of mental health records was misplaced, the in camera review amounted to no more than a preliminary finding of relevance . . . . The mere fact that the [complainant] did not object to disclosure was not determinative of the relevance or admissibility of the material." The state notes that the general standard of review for a trial court's decision to withhold privileged psychiatric records of an adverse witness from a criminal defendant, as with relevance rulings, is the "abuse of discretion" standard.

was to be left to the discretion of the trial court, "[a]s in the case of admissibility of such records . . . ." This standard is not applicable in this case, where, again, the complainant has consented to waive her confidentiality privilege as to the records.

After carefully inspecting the exhibits that were withheld from the defendant, we conclude that a constitutional violation has occurred and that the state has not sustained its burden to establish that the violation was harmless beyond any reasonable doubt. Cf. *State* v. *Slimskey*, supra, 257 Conn. 858–59. In *Slimskey*, our Supreme Court set forth considerations that led it to the conclusion that a constitutional violation had occurred in the failure to relinquish psychiatric records to a defendant for impeachment purposes. Chief among these was the observation that the withheld material was "relevant to and probative of the [complainant's] ability to comprehend, to know and to relate the truth [and] [a]s a consequence, the defendant had *no* opportunity to elicit [such] evidence," which, with proper trial court action, would have been elicited on cross-examination. Id. The withheld material in the case before us plainly implicates the complainant's faculties of memory. This material, as in *Slimskey*, is "especially probative" and there was "no other available means of inquiry" into the deficiencies in reliability that this impeachment material raises. As a result, a constitutional violation has occurred and the state bears the burden to establish that the violation was harmless beyond any reasonable doubt. Id., 859.

The *Slimskey* court considered several factors in determining that a constitutional error in failing to release psychiatric records was not harmless in that case. We turn to analyze these factors and relate the evidence to each of them in series.

First, we consider the "importance of the witness' testimony in the prosecution's case . . . ." (Internal

quotation marks omitted.) Id. In the present case, the trial court recognized the crucial nature of the testimony of the complainant, who served as the state's principal witness. The court observed that "[the defendant] . . . has the rights to confrontation and to impeach," "particularly here in a case where it is a one-on-one, so to speak, and I hope that term is understood in the sense that . . . it is a complaining witness alleging something that would have happened in a private setting as I understand the allegations here." We agree with the trial court's assessment of the importance of the complainant's testimony. The state relied heavily on this witness in making its case. Outside of the complainant's testimony and prior statements, the state did not have evidence to meet the elements of the crime charged. The state did not introduce any physical evidence of the alleged crime. The state did not have semen evidence and the complainant's pregnancy tests were negative.

The *Slimskey* court also looked to whether the damaging potential of the cross-examination which could have been developed was merely "cumulative" in the context of the remaining evidence. Id. We conclude that it would not have been cumulative. For example, lack of certain reports withheld made it impossible to adequately impeach the witness' testimony that her schizophrenia was "chronic" and not simply related to drug use which had ended.

The *Slimskey* court also looked to the presence or absence of independent evidence "corroborating . . . the testimony of the witness on material points . . . ." (Internal quotation marks omitted.) Id. In this case, statements taken from the complainant both corroborated and contradicted her testimony, since she initially denied that the sexual encounters had taken place. Thus, her testimony and its reliability were of utmost importance at trial.

*Slimskey* also considered the "extent of cross-examination otherwise permitted . . . ." (Internal quotation marks omitted.) Id. As discussed previously, the defendant was restricted in his line of questioning from impeaching the complainant's explanation of her diagnosis of schizophrenia. She claimed that an episode of "hearing voices" was attributable to drug use only and that she was "misdiagnos[ed]." With the impeachment material that indicated that this was actually a "chronic" condition, the cross-examination could have challenged the complainant's assertion that it was an isolated incident. Without the material, any continued inquiry would have been far less effective. New lines of impeachment were also foreclosed in the absence of the withheld material. Documents indicating that the complainant suffered from dissociative disorder, "impaired" memory and cognition, and "fair" judgment, were withheld. Nor did the defense have access to material indicating that the complainant was taking Cogentin, a drug that can impact mental capacity. Thus, the defendant's actual cross-examination was greatly limited in comparison to the cross-examination that would have been possible with the withheld impeachment material.

Finally, we consider the "overall strength of the prosecution's case." Id. For the same reasons relating to the importance of the complainant's testimony, the state's case was nonexistent in the absence of the complainant's testimony and prior statements.

For all of these reasons, we hold that the defendant's constitutional right to confrontation was harmfully violated by the excessive restriction of access to impeachment material.

The judgment is reversed and the case is remanded for a new trial.

In this opinion SHEA, J., concurred.

SCHALLER, J., concurring in part and dissenting in part. I agree that the judgment of conviction must be reversed and the case remanded for a new trial because the defendant improperly was deprived of an opportunity to have access to the complainant's psychiatric records. I write separately, however, because I do not agree with the majority's analysis that leads to this conclusion. I also believe that in light of the procedural issues that may arise in the new trial, it is both unnecessary and inappropriate for this court to discuss the complainant's records in detail.

I conclude, as does the majority, that General Statutes § 52-146e and the confidential protection it offers, does not apply once a party who is protected by the statute voluntarily and affirmatively discloses a protected record. The privileged protection afforded to the complainant's records under § 52-146e dissolved in the present case once she agreed to disclose fully her treatment records and waived her right to keep them confidential.

I reach this conclusion as a matter of plenary review of § 52-146e (a) and based on our well established rules of statutory interpretation. Contrary to the majority's approach, I believe that it is crucial to begin the analysis with a discussion of § 52-146e because the applicability of the statute is a threshold matter in the present case.

Having reached the predicate conclusion that § 52-146e does not apply in this case, I further conclude, as does the majority, that because the records no longer were confidential or protected as such, the trial court had no authority to invoke its "gatekeeping" function in which it performs an in camera review of the confidential records and determines whether they should be disclosed to the party seeking them. Because an in camera review was not required, the court had no discretion to review or withhold the documents. Under these circumstances, *State* v. *Esposito*, 192 Conn. 166,

471 A.2d 949 (1984), and its progeny do not apply. As soon as the waiver was given, the defendant was entitled to disclosure of the records without any discretionary assessment or restriction by the court.

I do not agree that the decision as to whether the in camera review process applies in this case is an "issue [that] concerns the construction of a statute," as the majority asserts. I believe the construction of the statute is a predicate conclusion, as previously discussed, because if the statute does not apply, the court has no authority to perform an in camera review. Additionally, § 52-146e itself does not require an in camera review, so a discussion of the statute in this regard is inappropriate. The in camera review process is a judicial construct, created to ensure that the statutory protections are met. The majority's discussion of § 52-146e in the context of the in camera review process is not appropriate. The decision as to whether an in camera review is necessary relies on the predicate decision as to whether the statute affords protection.

As the majority notes, the next step is to evaluate the impact of the nondisclosure. I believe that we should apply our well settled harmful error analysis for sixth amendment claims in which the appellant asserts that he was denied his right to confront and to cross-examine a witness against him. See *State* v. *Slimskey*, 257 Conn. 842, 859, 779 A.2d 723 (2001). Because the restriction that occurred implicates the defendant's constitutional right to impeach and to discredit a witness, whether this impropriety warrants a new trial depends on whether the state can demonstrate harmlessness beyond a reasonable doubt. See *State* v. *Rolon*, 257 Conn. 156, 173–74, 777 A.2d 604 (2001).

I would conclude, on the basis of our in camera review of the psychiatric records, that the state has failed to make such a showing. The records contain

material that could be used by the defendant for impeachment purposes. Although the defendant did exercise his right of cross-examination of the complainant concerning her mental condition, he is entitled to the opportunity to do so after having access to the materials in question.

I disagree with the majority's detailed discussion of the records. It is not necessary or appropriate to discuss our opinion concerning what our own in camera review of the records revealed and how the records could be used by the defendant in the course of a trial. Such discussion is not necessary because, based on my interpretation of § 52-146e, the initial in camera review should not have been conducted at all. Our opinion concerning the relevance of the records, as opposed to that of the trial court, is immaterial. Apart from that consideration, we should not reveal the details of the records or suggest how they could be used to present a defense in this case.

Nor is that discussion appropriate. The complainant will undoubtedly be given the opportunity to decide whether to consent to disclosure of the confidential records again at the time of the new trial. Although the complainant did consent to disclosure at the first trial and may consent again, that eventuality cannot be predicted with certainty. See *State* v. *Olah*, 60 Conn. App. 350, 355, 759 A.2d 548 (2000). Should she decide not to do so at the new trial, an in camera review with its pertinent waiver procedures may be necessary. See id.; see also *State* v. *Slimskey*, supra, 257 Conn. 855–56 (discussing in camera review procedure). Should that be the case, the complainant may decide to maintain the confidential status of her records. See *State* v. *Olah*, supra, 355. The majority's discussion of the contents of the records, accordingly, details records that, ultimately, may not be disclosed at all. Even if she does consent for purposes of a new trial, I believe that we

should neither speculate about how the records may be used nor suggest ways in which they could be used.

There are compelling reasons why we should not expose the complainant's psychiatric records to discussion and analysis in our opinion. For all the foregoing reasons, I respectfully concur in the result reached by the majority and dissent with regard to its discussion of the records.