STATE OF CONNECTICUT *v.* SHAWN SELLS
(AC 23193)

Foti, Bishop and West, Js.

Argued December 9, 2003—officially released April 6, 2004

*Louis S. Avitabile*, special public defender, for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Robin A. Lipsky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Shawn Sells, appeals from the judgment of conviction, rendered after a jury trial, of one count of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1) and two counts of risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (1) and (2). On appeal, the defendant claims that (1) he was denied his right to a fair trial due to prosecutorial misconduct, (2) his federal constitutional right to confrontation was violated by the court's refusal to disclose a psychological report of the victim, and (3) the defendant's federal and state constitutional rights to confrontation were violated when the court refused to allow him to impeach his accuser through the use of extrinsic evidence. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts relevant to our discussion of the issues on appeal.

In 1998, when Donald Garcia befriended the victim, M,[1] the two began spending a significant amount of time together. Garcia soon became a "father figure" to M, providing him with numerous gifts, as well as marijuana and alcohol. Later, Garcia importuned the victim for sexual favors and performed fellatio on the then twelve year old M. M also began to frequent Garcia's residence where Garcia photographed M's genitals and exposed him to a plethora of pornographic materials that were stored on a computer. During that time period, D, who is M's mother, engaged in sexual intercourse with M on at least two occasions.[2]

In April or May, 2000, after Garcia met the defendant in an Internet chat room, they engaged in a brief sexual relationship, and the defendant began residing at Garcia's home. The defendant subsequently met M's mother and they too engaged in a sexual relationship at Garcia's residence. During that time, the defendant developed an interest in M and asked Garcia if he could share M with him. On at least two occasions, the defendant performed fellatio on the then fifteen year old M. On September 14, 2000, T, another youth residing at the Garcia residence, was arrested in an unrelated matter. During a police interview, T revealed the sexual abuse that was occurring at the Garcia residence. Garcia then became the target of a police investigation. On September 21, 2000, the defendant, of his own doing, turned over to the Federal Bureau of Investigation (FBI) all of Garcia's pornographic computer files. When M was interviewed by the police in connection with the ongoing investigation, he gave a statement in which he alleged sexual abuse by Garcia, his mother and the

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] D currently is incarcerated after having been found guilty of having had sexual intercourse with her son.

defendant. D also gave a statement corroborating M's accusations as to Garcia and herself.

Garcia pleaded guilty, and D, in a separate trial, was later convicted of having sexually abused M. At trial, Garcia and D admitted in their testimony that they had abused M. Garcia corroborated M's allegations against the defendant. Additionally, M testified that the defendant had sexually abused him. The defendant testified and denied engaging in sexual conduct with M. The gravamen of his defense was that M and Garcia had conspired to accuse the defendant falsely of sexual assault out of jealousy over the defendant's relationship with D and in revenge against the defendant for having reported Garcia's criminal behavior to the authorities. The defendant was convicted on all three counts and was sentenced to a total effective term of twenty years incarceration, execution suspended after twelve years, and ten years probation. This appeal followed.

I

The defendant first claims that he was deprived of a fair trial because of prosecutorial misconduct during cross-examination and closing argument in violation of his rights under the sixth and fourteenth amendments to the United States constitution. We disagree.

We begin by addressing the relevant legal principles. We note that because the defendant's constitutional claims were not preserved at trial, the defendant seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). As an initial matter, we conclude that the first two prongs of *Golding* have been met. The record is adequate for review, and it is well settled that prosecutorial misconduct can result in the deprivation of a defendant's due process right to a fair trial. *State* v. *Pepper*, 79 Conn. App. 1, 19, 828 A.2d 1268, cert. granted on other grounds, 266 Conn. 919, 837 A.2d 801 (2003).

"The third prong of *Golding* requires the defendant to show that the alleged constitutional violation clearly existed and that it clearly deprived him of a fair trial. In cases of prosecutorial misconduct, to make that determination, we employ a two-part test. . . . First, we determine if the remarks were improper, and, if they are found to be so, we determine whether they caused such substantial prejudice to the defendant as to deny him due process of law." (Citation omitted.) *State* v. *Vazquez*, 79 Conn. App. 219, 223, 830 A.2d 261, cert. denied, 266 Conn. 918, 833 A.2d 468 (2003). With those principles in mind, we turn to the defendant's claims. Additional facts will be set forth as necessary.

A

The defendant first contends that the prosecutor improperly asked the defendant to vouch for the credibility of a witness in violation of *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002). He argues that the prosecutor's behavior constituted a cumulative pattern of misconduct that culminated when the prosecutor emphasized the defendant's testimony in closing argument to the jury. We disagree.

At trial, the defendant testified that the statements made by M were false. During direct examination of the defendant, defense counsel asked, "Why would [M] lie about you?" The defendant responded: "Because I took everything away by exposing [Garcia]. . . . When I told about [Garcia] and got the proof that I needed to prove [that he] was doing all these terrible things, [Garcia] got arrested, his mother got arrested. Everything was taken away from him." Shortly thereafter, on cross-examination, the prosecutor asked: "I know that you have your reasons as to why [M's] going to come in and lie, why [Garcia] would come in and lie. Is there any reason that you know of why Tonya [another witness who testified against the defendant] would come

in and lie?" On appeal, the defendant argues that the prosecutor's questioning of the defendant as to another witness' motive for lying was improper and that this impropriety deprived him of a fair trial.

It is a "well established evidentiary rule that it is improper to ask a witness to comment on another witness' veracity." *State* v. *Singh,* supra, 259 Conn. 706. That is so because such questions not only invade the province of the jury, in that determinations of credibility are for the jury to decide, but those questions also have no probative value because they are not helpful to the jury in assessing a witness' credibility. Id., 707–708.

Although the defendant relies on *Singh* to support his arguments, the facts of *Singh* are inapposite. In the present case, unlike *Singh,* the defendant expressed his views of the veracity of the state's witnesses during his direct examination. Thus, the defendant opened the door for cross-examination on the subject of the credibility of the state's witnesses. See *State* v. *Morascini,* 62 Conn. App. 758, 766, 772 A.2d 703, cert. denied, 256 Conn. 921, 774 A.2d 141 (2001). "As a general rule . . . if a party delves into a particular subject during examination, he is said to have 'opened the door' for further examination regarding that subject." Id. Once that door was opened, the prosecutor had the right to inquire into the defendant's statement and ask whether all the witnesses in the case were lying. Cf. *State* v. *Burton,* 258 Conn. 153, 169, 778 A.2d 955 (2001) (holding that in light of defendant's attack on credibility of state's witnesses, prosecutor did not commit misconduct during closing argument when he implied state's witnesses were credible). Therefore, in her cross-examination of the defendant, the prosecutor did not commit misconduct, and it was not improper for her to emphasize his testimony in her closing argument.

## B

The defendant also claims that as part of the cumulative pattern of prosecutorial misconduct, the prosecutor, in her final arguments, improperly expressed her views on the evidence and the credibility of the witnesses, commented on matters that were not part of the record and attempted to appeal to the emotions, passions and prejudices of the jury.[3] That claim fails

[3] The defendant alleges that the following eleven statements by the prosecutor were improper expressions of personal opinion:

(1) "Does it make sense to you that [M] would come in here and testify before you, go to the police and give a statement to the police and tell them that all three people have been sexually abusing him for years, and it happens that we know that two of those are absolutely, positively proven and one just happens to be, according to the defendant, a total fabrication?"

(2) "[I]n order to accept the defendant's version of what you must believe, really, to find there is reasonable doubt here, you would have to believe that [M], a person who is learning disabled, with a low IQ . . . who has had difficulty in reading and speech, all kinds of scholastic issues, concocted this version, that then he went to the police and told almost two years ago. . . . He then lasted for two years with this story, or a year and one-half, has now come in and testified, again, in great detail, before you, the jury. . . . He's on the [witness] stand for two days answering these questions, still says that's absolutely what happened to me. . . . [Defense counsel] wants you to believe, the defense wants you to believe that's a lie concocted by [M]."

(3) "Well, nobody has a greater bias than the defendant has, so you need to think about that when you are evaluating his testimony. He's the one who has everything to lose. In contrast, what reason does [M] have to lie? . . . Well, let's think about what has happened to his life since he made this statement. His mother has been taken away from him. . . . Don Garcia, taken away."

(4) "Think about how difficult it must be for a boy of sixteen years old, just trying to deal with all these issues of growing up and sexual orientations and all the things that you have to deal with at sixteen, to come in before you, the jury, strangers, adults, and have to tell you what happened. Is this something you think he'd sign up for willingly?"

(5) "Every time [M] was asked a question, he just answers it. He was looking down. He was rubbing his hands together, every single time. Compare that to the way the defendant testified. Every time I asked the defendant a question when he was on the [witness] stand, never once did he give me a straight answer. Not once. From the time he stood up there and took the oath and said, 'damn skippy,' until the time he got off that [witness] stand, never once did he answer me directly."

to satisfy the third prong of *Golding,* as the alleged constitutional violations did not clearly exist, and the alleged misconduct did not deprive the defendant of a fair trial.

It is well established that prosecutorial misconduct can occur in the course of closing argument. See *State* v. *Atkinson,* 235 Conn. 748, 768–69, 670 A.2d 276 (1996). "While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury [has] no right to consider." (Internal quotation marks omitted.) *State* v. *Pouncey,* 241 Conn. 802, 811, 699 A.2d 901 (1997).

Because the defendant's claim has three parts, we will examine each in turn. The defendant argues that the prosecutor committed misconduct by repeatedly expressing her personal views about the witnesses and the evidence. We disagree.

(6) "This [defendant] is a manipulator, ladies and gentlemen, don't let him manipulate you."

(7) "Let's talk about a man who tells you, the jury, that he is trisexual. . . . He tells you, I'm trisexual, I think the judge even said, what's that mean, and he starts explaining it. Well, it does occur at first, but trisexual is not tri as in three, t-r-i, it's try-sexual, as in t-r-y, try anything that's sexual."

(8) "[I]f he was going to lie and come in here and tell you this total lie about the defendant sexually abusing him, then why wouldn't he make himself out to be more of a hero? Why wouldn't he say, I tried to fight him off, I screamed and pushed, and I did everything else?"

(9) "I submit to you, because as painful as it is, he's telling you what happened."

(10) "You have to say to yourself, would all these people come in and testify, one on top of the other, tell you what's happening . . . and all independently be lying to you?"

(11) "The defendant has to tell you that's not true, because, obviously, if it is true, the elements of the crime have been proven, and that is what I submit to you . . . that the state has been able to prove the case beyond a reasonable doubt."

"In a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue that one of the two sides is lying. . . . While the prosecutor is permitted to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses." (Internal quotation marks omitted.) *State* v. *Jefferson*, 67 Conn. App. 249, 271, 786 A.2d 1189 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002).

In the present case, the prosecutor did not, as the defendant contends, express her personal views of the evidence or vouch personally for the truth and veracity of the state's witnesses. Our careful review of the record reveals that the prosecutor set forth the evidence and asked the jury to weigh that evidence to determine whether the state's witnesses were lying. The defendant attacked the credibility of the state's witnesses at length. We have held that in such circumstances, it is not inappropriate for a prosecutor to present alternatives to the jury in contrast to a defendant's suggestion that the state's witnesses must be lying. Id., 272. Additionally, our review of the record reveals that in making the comments now assailed by the defendant, the prosecutor was permissibly arguing the inferences the jury could have drawn from the evidence adduced at trial regarding witness credibility. See, e.g., *State* v. *Cotton*, 77 Conn. App. 749, 773, 825 A.2d 189, cert. denied, 265 Conn. 911, 831 A.2d 251 (2003). The statements were not improper.

The defendant also asserts that that the prosecutor expressed her personal opinion during closing argument when she used the pronoun "I" 104 times. That argument lacks merit.

As we have stated: "Undoubtedly, using the pronoun I in an argument increases the chances that appropriately

structured arguments will deteriorate into expressions of personal opinion. Prosecutors should be circumspect and artful in designing their arguments to avoid having a jury misinterpret such remarks as improper expressions of personal opinion. . . . Nevertheless, [t]he mere use of phrases such as I submit, I find, or I believe does not constitute improper argument. . . . Use of the personal pronoun I is a normal and ordinary use of the English language. If courts were to ban the use of it, prosecutors would indulge in even more legalese than the average lawyer, sounding even more stilted and unnatural." (Citation omitted; internal quotation marks omitted.) *State* v. *Moody*, 77 Conn. App. 197, 217, 822 A.2d 990, cert. denied, 264 Conn. 918, 827 A.2d 707, cert. denied, 540 U.S. 1058, 124 S. Ct. 831, 157 L. Ed. 2d 714 (2003). The prosecutor's frequent use of the pronoun "I" was not, per se, improper and, in this instance, did not constitute the improper expression of personal opinion.[4]

The defendant also alleges that on numerous occasions the prosecutor commented on matters that were not part of the record.[5] We are not persuaded. Although we note that a prosecutor, in fulfilling his or her sworn duties, must confine the arguments to the evidence in the record; see *State* v. *Binet*, 192 Conn. 618, 631, 473 A.2d 1200 (1984); our review of the record leads us to

[4] Even if we assume arguendo that the comments were improper, any harm to the defendant was belied by other statements made by the prosecutor and in the court's charge to the jury. In her argument to the jury, the prosecutor stated that "you, as jurors, are finders of facts and whatever you believe to be true, that is what is significant, so please don't assume that if I mistake it and I say, 'I,' I'm referring to my personal opinions. I am not." The court, too, in its charge to the jury repeatedly reiterated that the jurors were the finders of fact and that statements made during closing arguments were not evidence from which the jury could find the defendant guilty.

[5] In support of his claim, the defendant argues that some of the statements that allegedly were improper statements of personal opinion also referred to matters that were not in evidence. Those statements are set forth in footnote 3.

conclude that the prosecutor's argument did not refer to matters that were not in evidence, nor did it invite the jury to resort to speculation. Every appeal to common sense does not need to be supported by an evidentiary underlayment, nor does an invitation to the jury to apply wisdom learned from the ordinary experiences of life to the facts fairly adduced at trial.

Last, the defendant claims that the prosecutor improperly appealed to the emotions, passions and prejudices of the jury. Although we agree that the prosecutor did, on one occasion, make an improper reference to the use of emotion, we conclude that the defendant was not harmed by that misstep.

The defendant makes two arguments in support of his claim. First, he argues that the prosecutor invited the jurors to use their emotions when she stated that "you can use your experience, your emotions to evaluate the evidence and the testimony, and decide the credibility of the witnesses and the evidence that's presented before you. So, don't do it in a vacuum because that's why you were all chosen."

The prosecutor's suggestion to the jurors that they could use their emotions in deciding the issues was improper. We conclude, however, that this statement was isolated and not egregious. Additionally, any harm that could have been caused by the statement was offset by the court's instructions to the jurors that they could not use their emotions and that the closing arguments were not evidence. "In the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 485, 832 A.2d 626 (2003). As there is no indication that the jury did not follow the court's general instructions, that claim must fail.

The defendant's second argument that the prosecutor improperly appealed to the emotions of the jury is a reiteration of his previous claim concerning her remarks during closing argument. Because we have concluded that the statements during closing argument were proper, that claim also fails.[6]

## II

The defendant next claims that he was denied a fair trial because he was deprived of the right to present a defense and the right to confront witnesses in violation of the sixth and fourteenth amendments to the United States constitution. Specifically, he alleges that the court (1) abused its discretion by failing to turn over exculpatory information in a psychologist's report after conducting an in camera inspection and (2) improperly refused to declare a mistrial on the ground that the state had suppressed exculpatory information. We address each claim in turn.

The following factual and procedural information is pertinent to our consideration of those claims. In April, 2001, in conjunction with a then pending assessment of M's home environment, David Mantell, a psychologist, conducted a cognitive and psychological evaluation of M and his younger sister for the Superior Court hearing juvenile matters and prepared a written report following the evaluation. Prior to the start of trial, the state obtained a waiver from M's guardian permitting disclosure to the prosecution of M's school records, records

---

[6] The defendant also claims that this court, pursuant to its supervisory powers, should reverse his conviction to redress the repeated and deliberate misconduct of the prosecutor. Specifically, the defendant asserts that the exercise of such supervisory power is appropriate in that the prosecutor previously has been chastised once by this court for improprieties and that, as a result, a reversal of the conviction is necessary to address that pattern of misconduct. Having concluded that the prosecutor did not act improperly during this criminal trial, we conclude that there is no reason to exercise our supervisory powers to reverse the judgment of conviction.

from the department of children and families (department) and Mantell's report. Once the prosecutor's office obtained a copy of those records and had an opportunity to review them, the prosecutor then turned them over to the court for the court to conduct an in camera inspection to determine whether they should be disclosed to the defendant.[7]

On January 11, 2002, during the cross-examination of the victim, the defendant inquired of the court whether any of the information turned over by the state would be made available to the defendant. Without objection by the state, the court turned over copies of M's school and department records to the defendant. The court, however, declined to turn over Mantell's report, having concluded that it was not exculpatory. The court then ordered the report sealed and marked as a court exhibit. The defendant continued his cross-examination of M and later requested access to Mantell's report. Again, the court denied the request.

Later, during its case-in-chief, the state presented the testimony of Sidney Horowitz, a clinical psychologist, as an expert witness regarding the behavior of sexually abused adolescents. During cross-examination of Horowitz, when it was revealed that the state had provided Horowitz with Mantell's report, the defendant renewed his request to have access to the report. Although Horowitz testified that he had not relied on the Mantell report in his testimony, the court again reviewed Mantell's report and denied the defendant's request, concluding that the report was not exculpatory, as it concerned merely "the appropriateness of the placement of [M] in [his] uncle's home."

After closing arguments and before the court charged the jury, the defendant filed a motion for a mistrial, alleging that the prosecutor's failure to turn over Man-

---

[7] As we will discuss, that procedure was improper.

tell's report to the defense in a timely manner violated the tenet of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), that the state has an affirmative obligation to provide a defendant in a timely manner with any exculpatory information in its possession. The court denied the motion for a mistrial, concluding once again that Mantell's report was not exculpatory.

Prior to oral argument before this court, we reviewed Mantell's report and discovered that page seven of the eighteen page numbered report was missing. As a result, we then directed the prosecutor's office to review its files and to submit the missing page to the trial court. When the state represented to this court that it did not have possession of page seven,[8] we directed the court to order the state to obtain the missing page from Mantell and to file it with the trial court with further direction that the court, on receipt of the page, supplement the record with it.[9] Subsequently, the previously missing page seven has become part of the record on appeal.[10]

### A

### In Camera Review

The defendant first claims that the court's failure to disclose Mantell's report following its in camera inspection violated his federal constitutional right to confront witnesses. Before addressing that claim, we note that

---

[8] On January 20, 2003, John A. East III, a senior assistant state's attorney, submitted to this court a letter indicating that the state did not have page seven. A copy of the letter was sent to the defendant's counsel.

[9] On January 22, 2004, pursuant to Practice Book § 60-2, this court ordered the trial court, *Cofield, J.*, to complete the trial court record for proper presentation of this appeal by ordering John A. East III, a senior assistant state's attorney, to obtain the missing page from Mantell and to file it under seal with the trial court.

[10] We undertook those extraordinary steps to complete the record and to ensure that the issue could be assessed fairly. Such unilateral action on our part should have been avoidable.

although the court did conduct an in camera inspection of the Mantell report, no in camera inspection would have been necessary if the prosecutor had fulfilled her *Brady* responsibilities properly.

Although our courts have established a procedure for the trial court to examine sealed department records in camera to determine whether they should be turned over to the parties; see, e.g., *State* v. *Walsh*, 52 Conn. App. 708, 722–23, 728 A.2d 15, cert. denied, 249 Conn. 911, 733 A.2d 233 (1999); that procedure does not apply when the complainant has waived his rights to confidentiality in the records and the records have been directly turned over to the prosecutor's office. See *State* v. *Palladino*, 69 Conn. App. 630, 796 A.2d 577 (2002) ("[w]here the state's complaining witness has freely agreed to the use of [his records] . . . there is no further initial gatekeeping role for the court"). In the present case, as noted, M's guardian consented to the release of M's records. The records were therefore no longer confidential, and the court should have turned over the report to the defendant.

Our inquiry turns, therefore, to the impact of the court's failure to give the report to the defendant. In making that analysis, we must necessarily review the report and examine how the information relates to the defendant's constitutional rights. Id., 638.

"The sixth amendment to the United States constitution, as well as article first, § 8, of the constitution of Connecticut, guarantees the right of an accused in a criminal proceeding to be confronted with the witnesses against him." (Internal quotation marks omitted.) Id. "The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and

prejudice is a matter of right and may not be unduly restricted." (Internal quotation marks omitted.) *State* v. *Abernathy*, 72 Conn. App. 831, 836, 806 A.2d 1139, cert. denied, 262 Conn. 924, 814 A.2d 379 (2002).

We have carefully reviewed Mantell's complete report and conclude that it does contain information that should have been made available to the defendant. The gravamen of the defendant's claim at trial was that Garcia was a father figure to M and that out of loyalty to him, M had conspired with Garcia to accuse the defendant wrongly of the charged crimes. The defendant argued that M did this as revenge because the defendant had given the authorities incriminating information relating to Garcia. The Mantell report contained exculpatory information that M believed the defendant had attempted to blackmail Garcia. As the state's case relied, in part, on the testimony of M, the defendant should have been afforded every opportunity to explore M's motive and bias for accusing the defendant.

The Mantell report also contained some indication that M had limited short-term memory and a statement from M that he did not fully recall the assaults on him. As "[t]he capacity of a witness to observe, recollect and narrate an occurrence is a proper subject of inquiry on cross-examination"; (internal quotation marks omitted) *State* v. *Wegman*, 70 Conn. App. 171, 190, 798 A.2d 454, cert. denied, 261 Conn. 918, 806 A.2d 1058 (2002); the portion of the report dealing with M's cognitive functioning should have been provided to the defendant.

Our determination that the court improperly failed, however, to disclose portions of the report to the defense does not end our analysis. If such a failure is harmless, the defendant is not entitled to a new trial. In this instance, because the deprivation is of constitutional magnitude, the state bears the burden of proving that the violation was harmless beyond a reasonable

doubt. See *State* v. *Slimskey*, 257 Conn. 842, 859, 779 A.2d 723 (2001). "The correct inquiry for identifying harmless constitutional error is to ask whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Santiago*, 224 Conn. 325, 333, 618 A.2d 32 (1992).

Our review of the record and the excluded report leads us to the conclusion that the failure to provide the Mantell report to the defendant was harmless beyond a reasonable doubt. As noted, the exculpatory information contained in the report, most of which we observe was contained on page seven, pertained to M's somewhat impaired cognitive functioning, and his motivation and potential bias against the defendant and in favor of Garcia. Although that information arguably could have been useful to the defense, it already was available to the defense in other forms. Concerning M's attitude toward the defendant and affinity for Garcia, both M and Garcia testified that Garcia was a "father figure" to M and that Garcia had abused M.[11] Moreover, during cross-examination, Garcia admitted that the defendant had attempted to blackmail him and that the defendant had provided the FBI with information that led to his arrest and eventual conviction. He also testified that he thought M had been present when the defendant

---

[11] One can hardly think of a more tortured use of the term "father figure."

had threatened to turn over Garcia's child pornography to the police. M also admitted during cross-examination that he was aware that the defendant had been threatening Garcia and that he was angry at the defendant for providing information to the FBI. The jury was therefore made fully aware of the nature of the relationship between Garcia and M, and was presented with evidence of M's affinity for Garcia and his attendant bias and motive to accuse the defendant falsely in retaliation for what he had done to Garcia. Because the Mantell report contained no fresh information in that regard, its contents merely were cumulative.

To the extent that the report also contained information that bore on M's lack of short-term memory, that insight was also cumulative, as M's school records were replete with information pertaining to M's cognitive functioning.

Additionally, although the report included some indication that M had told Mantell that he did not recall the precise facts of the sexual assaults, it also contained recitations by M of the nature of the assaults against him by the defendant that were consistent with his trial testimony. Thus, to the extent the report could have been used to assail the victim's credibility, his cognitive deficiencies were made known to the defendant by the access to the school records, and M's comment to Mantell that he did not fully recall the events was belied by his recitation to Mantell of the defendant's assaults on him in a manner that was consistent with M's trial testimony.

In sum, although the Mantell report contained exculpatory information that should have been provided to the defendant, it also contained information that was corroborative of the victim's accusations. Although access to the report could have provided fodder for defense counsel's cross-examination of M, its use by

the defendant also would have given the state further opportunity to demonstrate the constancy of the victim's accusations.

## B

### *Brady* Violation

The defendant next argues that the court incorrectly denied his motion for a mistrial, which was based on an alleged *Brady* violation.[12] We disagree.

We begin with the legal principles that guide our inquiry. "[T]he trial court's decision regarding . . . a *Brady* violation will be overturned only upon a finding of clear abuse of discretion." (Internal quotation marks omitted.) *State* v. *St. Pierre*, 58 Conn. App. 284, 294, 752 A.2d 86, cert. denied, 254 Conn. 916, 759 A.2d 508 (2000). "Since the advent of *Brady* v. *Maryland*, [supra, 373 U.S. 83], it has been clear that a prosecutor is under a duty to disclose to a defendant any evidence he possesses that is both favorable to the accused and material to guilt or punishment." *State* v. *John*, 210 Conn. 652, 669, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989). "To establish a *Brady* violation, the defendant must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) it was material [either to guilt or to punishment]." (Internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 452, 758 A.2d 824 (2000). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

---

[12] In his motion for a mistrial, the defendant also argued that the prosecutor misstated the evidence in her closing argument. Specifically, he alleges that Mantell's report contradicts what the prosecutor said in her closing argument. As Mantell's report was not in evidence, we find that claim to be simply without merit.

outcome." (Internal quotation marks omitted.) *State* v. *Breton*, 264 Conn. 327, 355 n.20, 824 A.2d 778, cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 708 (2003).

In this case, the prosecutor was under a duty to provide the report, or portions of it, to the defendant if it contained exculpatory information. That obligation was triggered when the prosecutor received the report. Measuring the prosecutor's *Brady* responsibility from the pretrial perspective when she alone had that information, she should have provided in a timely manner the portions of the Mantell report to the defense concerning M's awareness of the antagonism between the defendant and Garcia, his allegiance to Garcia and his cognitive functioning. Because that information potentially bore on the victim's bias against the defendant and motive for accusing him, as well as the victim's cognitive deficiencies, it was facially exculpatory.[13] Thus, the contents of the report satisfied the first two prongs of *Brady* in that the information was favorable to the defendant. Mindful, however, that we already have concluded that the suppressed exculpatory material was cumulative of information otherwise available to the defendant, we cannot conclude that there is a reasonable probability that if the material had been disclosed to the defendant, the outcome of the trial would have been different. In denying the motion for a mistrial, the court, therefore, did not abuse its discretion.

III

Last, the defendant claims that the court violated his federal and state constitutional rights to confront

---

[13] Although we accept the prosecutor's representation that she did not have page seven of the report in her possession before or during the trial, we are not persuaded that this factor is legally relevant. Because the prosecutor had received a paginated report, it was her responsibility to ensure that she had the report in its entirety so that she could discharge her *Brady* responsibilities properly.

witnesses and to present a defense when it precluded him from impeaching M with extrinsic evidence showing that he was an aider and abettor to and coconspirator with Garcia. We disagree.

The following additional facts are necessary for our resolution of that claim. During cross-examination, M testified that he would not lie on Garcia's behalf and denied that he had encouraged another youth to submit to acts of fellatio by Garcia. The defendant then sought to impeach M through the use of extrinsic evidence. Outside the presence of the jury, the defendant proffered the testimony of P, a youth who claimed that M had tried to persuade him to allow Garcia to perform fellatio on him and that eventually Garcia did, in the presence of M, perform fellatio on him.

Relying on General Statutes § 54-86f, the rape shield statute, the court ruled that P's testimony was not admissible. The court found that the issue of whether M had aided and abetted Garcia was too collateral to the case to justify exposing M's previous sexual history. The court further found that the testimony did not relate to whether the defendant had abused M and would serve only to distract and to confuse the jury. With those additional facts, we address the defendant's claim.

As previously stated, "[t]he sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . .

"Although it is within the trial court's discretion to determine the extent of [impeachment] and the admissibility of evidence, the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the [confrontation clause] of the sixth amendment. . . . Whether limitations on impeachment, including cross-examination, are so severe as to violate the confrontation clause of the sixth amendment is a question of law reviewed de novo." (Citations omitted; internal quotation marks omitted.) *State* v. *Abernathy*, supra, 72 Conn. App. 836–37.

"[I]n cases involving sexual crimes, [t]he rape shield statute [§ 54-86f] was enacted specifically to bar or limit the use of prior sexual conduct of an alleged victim of a sexual assault because it is such highly prejudicial material. . . . We must remember that [t]he determination of whether the state's interests in excluding evidence must yield to those interests of the defendant is determined by the facts and circumstances of the particular case. . . . In every criminal case, the defendant has an important interest in being permitted to introduce evidence relevant to his defense. Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . . Whenever the rape shield statute's preclusion of prior sexual conduct is invoked, a question of relevancy arises. If the evidence is probative, the statute's protection yields to constitutional rights that assure a full and fair defense. . . . If the defendant's offer of proof is sufficient to show relevancy, and that the evidence is more probative to the defense than prejudicial to the victim, it must be deemed admissible at trial. . . . When the trial court excludes defense evidence that provides the defendant with a basis for cross-examina-

tion of the state's witnesses, [despite what might be considered a sufficient offer of proof] such exclusion may give rise to a claim of denial of the right to confrontation and to present a defense." (Internal quotation marks omitted.) *State* v. *Cuesta*, 68 Conn. App. 470, 475–76, 791 A.2d 686, cert. denied, 260 Conn. 914, 796 A.2d 559 (2002).

We cannot conclude that the evidence sought to be admitted in this case was more probative to the defendant than it was prejudicial to M. We agree with the court that the issue of whether M had aided and abetted Garcia was collateral to the issue of whether the defendant had abused M. Furthermore, the defendant on cross-examination, while not allowed to impeach M with extrinsic evidence, questioned M and tested his credibility and his bias. As noted, the jury was made aware that M and Garcia had a relationship of affinity and that at some time during that relationship, Garcia had abused M. Evidence also was presented to show that the defendant had provided incriminating evidence to the FBI, which, in turn, led to the subsequent charges against Garcia. Therefore, the jury had sufficient evidence to evaluate the defendant's claims that he was being framed by M as revenge for the defendant's having aided the prosecution of Garcia. Moreover, in light of the policy behind § 54-86f and the highly prejudicial and personal nature of P's testimony, it was not improper for the court to limit the impeachment of M by extrinsic evidence. We therefore conclude that the defendant's constitutional right to confront witnesses was not infringed.

The judgment is affirmed.

In this opinion the other judges concurred.